EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ R. MATTEI TORRES c/p ÁNGEL LUIS TORRES RAMOS, acusado y apelante.

*Número:* CR-86-79      *Resuelto:* 16 de junio de 1988

*Felipe Cirino Colón,* de la *Sociedad para Asistencia Legal,* abogado del apelante; *Rafael Ortiz Carrión, Procurador General,* y *Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715, 732–733 (1980), recogimos la visión de que en "'procesos criminales contra acusados de violación, existe una tendencia a considerar la perjudicada como una pieza más de evidencia. El rol de la víctima es establecer un caso legal contra el ofensor; las víctimas frecuentemente informan que sus encuentros con la Policía, fiscales y personal del tribunal fueron más

traumáticos que el incidente de la violación.' *Judicial Attitudes Toward Rape Victims*, 57 Judicature 303 (1974)". Hoy, diversos estudios científicos demuestran que desde sus inicios la mayoría de las víctimas experimentan no sólo el ataque a su integridad corporal, sino diversas lesiones severas, de carácter psicológico, que oscilan desde miedo, ansiedad, paranoia, depresión, confusión, sensibilidad interpersonal, autoestima y ajuste social. Se ha confirmado que estos efectos perduran más tiempo de lo que originalmente se pensaba. P.A. Resick, *The Trauma of Rape and the Criminal Justice System*, 9 Just. Sys. J. 52 (1984); T.M. Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and its Implications for Expert Psychological Testimony*, 69 Minn. L. Rev. 395 (1985); J.V. Becker, L.J. Skinner, G.G. Abel, J. Howell y K. Bruce, *The Effects of Sexual Assault on Rape and Attempted Rape Victims*, 7 Victimology 106 (1982); B.S. Griffin y C.J. Griffin, *Victims in Rape Confrontation*, 6 Victimology 59 (1981); M.J. Walker y S.L. Brodsky, *Sexual Assault, the Victim and the Rapist*, 2da ed., Massachussetts, Lexington Books, 1976; D. Chappell, R. Geis y G. Geis, *Forcible Rape: The Crime, the Victim and the Offender*, Nueva York, Columbia Univ. Press, 1977. Esta realidad, científicamente avalada, forma parte del trasfondo contra el cual, como juristas, hemos de evaluar los planteamientos de José R. Mattei Torres ante este Foro.

I

*Incidencias procesales y hechos*

Mattei Torres fue acusado ante el Tribunal Superior, Sala de San Juan, de cometer los delitos de violación y sodomía en la persona de M.M.S., 33 L.P.R.A. secs. 4061 y 4065. Un jurado rindió veredicto *unánime* de culpabilidad. El tribunal lo condenó a treinta y cinco (35) y veinte (20) años naturales respectivamente. Como delincuente habitual, dispuso que

cumpliera las sentencias en forma concurrente entre sí, pero consecutivas con cualquier otra que estuviera cumpliendo.

Inconforme, cuestiona en apelación la legalidad de su arresto, la validez de su identificación, la apreciación de la prueba, la admisibilidad de dos (2) documentos, la negativa a unas instrucciones especiales y el decreto de delincuente habitual.

A los fines de examinar estos señalamientos de error[1] es menester exponer cronológica e integralmente los hechos que emergen de la prueba de cargo por voz de la víctima M.M.S., Ángel Luis Matías, Zoraida Meléndez, Dr. Fernando Rivera y Leyda Rodríguez Vélez, junto con la evidencia de naturaleza tangible y documental.[2]

La noche del jueves 20 de febrero de 1986, la perjudicada M.M.S.[3] —de veintisiete (27) años y 7mo grado de escolaridad— salió a dar una vuelta para buscar a su marido consensual Ángel Luis Matías. Como a las 9:00 P.M. llegó y entró al negocio "El Padrinito", localizado cerca de la luz (semáforo) de Cantera, Barrio Obrero, Santurce. Allí la conocían. Se puso a hablar con un muchacho de nombre Miguel, bajito, de pelo lacio, a quien conocía de vista. Éste le ofreció una cerveza y ella la aceptó. Momentos después llegó su marido,

---

[1] Prescindiremos del primero. El apelante Mattei Torres expresamente admite no tener "bas[e] sobre las cuales levantar argumento alguno en [su] apoyo". Alegato, pág. 17.

[2] A saber, siete (7) fotografías ilustrativas de los golpes y serias lesiones causadas en el rostro y cuello de la víctima, y sus prendas de vestir (mahón, medias, *panties* y zapatos *tennis*). Por la defensa declararon el agente Carlos Anselmi y el policía Juan Báez, ambos testigos iniciales del Ministerio Fiscal y renunciados como prueba acumulativa. También la defensa sometió unas fotografías del lugar del crimen. Infructuosamente intentó presentar en evidencia los documentos a los que aludiremos al discutir uno de los señalamientos de error.

[3] Además de la Exposición Narrativa de la Prueba, autorizamos la transcripción de su testimonio. Su análisis detallado y global nos ha permitido —hasta donde es posible desde este estrado apelativo— someterlo a un riguroso escrutinio y así comprender las razones para ciertas contradicciones e inseguridades que afloran del mismo.

quien —al verla tomando cerveza con Miguel— se disgustó y se puso a jugar billar. Ella se tomó un total de cuatro (4) cervezas. Después salió fuera del negocio y apareció un muchacho —quien resultó ser el acusado Mattei Torres— que se situó detrás de ella por varios minutos y le hablaba frases y decía cosas: "que yo estaba buena". T.E., pág. 11.(4) Poco después, salió su marido y ella lo llamó. Él no le hizo caso, pues estaba molesto. Tenía la intención de dirigirse a donde vive, en el Residencial Las Margaritas. Ella, cerca del negocio, comenzó a seguirlo. Al doblar la esquina, disgustado su marido se escondió para asustarla y le tiró con unas piedras. Entonces apareció el acusado Mattei Torres y lo recriminó diciéndole "dame a mí, ¿por qué no me tiras a mí?". E.N.P., pág. 5. Ambos pelearon. Con posterioridad, Matías recogió un paquete que se le había caído y se marchó solo.

M.M.S. observó el incidente. Optó por quedarse sola cerca del negocio y más tarde decidió irse hacia Las Margaritas. Mientras caminaba se percató de que alguien la seguía. Resultó ser el acusado Mattei Torres, quien se ofreció a acompañarla durante el oscuro trayecto. En determinado momento éste la "jaló" con fuerza y la condujo hacia un monte que le llaman "La Pista", en la Calle Constitución. Allí la mantuvo agarrada con un brazo alrededor de su cuello y otro en el hombro. La obligó a despojarse de todas sus ropas y prendas íntimas. La tiró sobre la tierra y la violó en varias ocasiones. Después la sodomizó. Contemporáneamente la golpeó en forma violenta en la cara y los ojos al extremo de que ella cayó y permaneció inconsciente, según su mejor recuerdo, como una hora. Al cabo del tiempo, como a las 5:00 A.M., se encontró desnuda, tirada y adolorida en el pastizal. Ella buscó su ropa. Se puso sólo la que encontró, a saber, su mahón y la camisa. En el lugar quedaron sus prendas ín-

---

(4) Inicialmente ella atestó que no lo había visto después. T.E., pág. 10. Subsiguientemente declaró que "de vista" sabía quién era. T.E., pág. 12.

timas, los *tennis* y sus medias. Todo el incidente duró aproximadamente siete (7) horas.

Inmediatamente M.M.S. se dirigió a la casa de su hermana Zoraida que estaba más cerca. No podía hablar ni ver debido a los puños que recibió. Tenía los ojos casi "tapados". T.E., pág. 34. Llamó a su hermana y con dificultad le explicó lo ocurrido. En un papel le escribió que se trataba de un hombre bajito, de pelo negro y gordito. No pudo hacer nada más y comenzó a vomitar. Su madre y hermana la llevaron al Dispensario Belaval, donde la refirieron a la Sala de Emergencia del Centro Médico. Allí, le describió al médico que la atendía lo mismo que a su hermana en cuanto al físico de su agresor. Luego regresó a su casa y se acostó. Después del examen médico, y no antes, adoptó medidas de limpieza e higiene de todo su cuerpo.

Al día siguiente por la noche, cuando su marido Matías fue a verla, le indicó que el individuo que había peleado con él era quien la había violado.

Con esta información, al otro día —sábado— Matías y su hermana Zoraida salieron a dar una vuelta en automóvil. Frente a un *liquor store*, en la Pda. 26, Santurce, éste vio a Mattei Torres y lo reconoció como el que lo había agredido anteriormente y había violado a M.M.S. Estaba con otra persona. Volvieron a pasar frente a él y lo observaron nuevamente. Una vez seguro, acudió al Cuartel de la Calle Eduardo Conde y le explicó al policía su apreciación. Inmediatamente fue arrestado.

Ese mismo día, la perjudicada fue llevada al cuartel por su esposo y hermana Zoraida. T.E., pág. 180. Todavía estaba enferma. Tenía la cara bien "hinchá" y los ojos "rojos". No podía casi hablar, *ver* ni mantenerse levantada. T.E., pág. 186. El acusado Mattei Torres estaba solo en una celda obscura. A preguntas de la Policía, con dificultad, ella lo reconoció. Íd. Después declaró que no lo pudo reconocer por estar muy enferma. T.E., pág. 189.

Al cabo de dos (2) semanas, cuando mejoró en salud, lo reconoció. En esta ocasión, su hermana Zoraida fue insistente. T.E., págs. 191–194. También un policía le preguntó. El acusado Mattei Torres fue quien la violó y sodomizó. T.E., pág. 200.

## II

*Identificación*

Mattei Torres sostiene que la identificación hecha por la perjudicada M.M.S. no fue confiable —por ser imprecisa, insegura y sugestiva— y ello lesionó su derecho a un juicio justo e imparcial y al debido proceso de ley. Argumenta que, a la luz de la totalidad de las circunstancias, a tenor con la Regla 252 de Procedimiento Criminal, según enmendada, 34 L.P.R.A. Ap. II, era imperativa la celebración de una rueda de detenidos o, en la alternativa, una combinación de ésta con la confrontación por medio de fotografías. A base de un análisis de la prueba y de la inseguridad mostrada por la perjudicada M.M.S. en su declaración, argumenta que no puede ser cierto que ella estuviera tanto tiempo sometida al control de su atacante o que no ocurrió la violación, y más bien, una relación sexual normal.

■ La norma prevaleciente para evaluar la confiabilidad de una identificación *es conjugar la totalidad de las circunstancias. Pueblo v. Rodríguez Maysonet,* 119 D.P.R. 302 (1987); *Pueblo v. Rey Marrero,* 109 D.P.R. 739 (1980); *Pueblo v. Peterson Pietersz,* 107 D.P.R. 172 (1978); *Pueblo v. Gómez Incera,* 97 D.P.R. 249 (1969). De ahí que una identificación maculada con alguna sugestividad, per se, no es inadmisible ni vicia la identificación positiva habida en el acto del juicio si está fundada en el conocimiento previo y recuerdo de la identidad del acusado por la víctima u otros testigos. *Pueblo v. Rey Marrero,* supra, pág. 747.

608

■ Bajo este enfoque los elementos de confiabilidad a considerarse son: (1) oportunidad que tuvo el testigo de observar al ofensor al momento del crimen; (2) grado de atención; (3) corrección de la descripción; (4) nivel de certeza en la descripción, y (5) tiempo transcurrido entre el crimen y la confrontación.

■ En situaciones en que la víctima conoce previamente al acusado, las salvaguardas contra la sugestividad tales como la rueda de detenidos y los requisitos establecidos en la Regla 252 de Procedimiento Criminal, *supra*, se reducen a un mínimo o, dependiendo de las circunstancias, son inaplicables e innecesarios. *Pueblo v. Lebrón González*, 113 D.P.R. 81, 99 (1982). Más aún, si la identificación es el resultado de unas gestiones separadas e independientes de la Policía, esto es, no "está en manos, o es dirigido o controlado, por los funcionarios del Estado", *Pueblo v. Rodríguez Maysonet*, supra, pág. 310, realmente no hay problema de identificación ni puede invocarse *Pueblo v. Gómez Incera*, supra, y su casuística filial.

■ Finalmente, debemos recordar que la "presencia de sugestión no excluye irremisiblemente la prueba, sino que impone al jurado o al juez constituido en tribunal de derecho la labor de separar campos en el testimonio para determinar su confiabilidad y la existencia de prueba de identificación no influida ni maculada por conducta sugestiva". *Pueblo v. Peterson Pietersz*, supra, pág. 184. Después de todo, la "inflexibilidad en la regla de exclusión que impide automáticamente que llegue al jurado prueba confiable y relevante por estar mezclada con aspectos sugestivos, frustra en vez de fomentar la justicia". Íd., pág. 183. En nuestro sistema de adjudicación, la "conclusión del juzgador de hechos sobre este punto tiene todo el respeto y validez que en apelación se extiende a las determinaciones de hecho. *Pueblo v. Suárez Sán-*

*chez*, 103 D.P.R. 10, 19, 21–22 (1974). (En reconsideración.)".
Íd., pág. 184.

Antes de propiamente concentrarnos en este señalamiento, debemos dejar sentado que es inaceptable la hipótesis del apelante Mattei Torres respecto a que la joven M.M.S. no fue violada ni sodomizada o, como sugiere, que mantuvo unas relaciones sexuales consentidas. Al igual que el Jurado —sin faltar a la verdad y al deber— no podemos descartar toda la amplia y abrumadora evidencia demostrativa de la ocurrencia y violencia de los actos. Más allá de toda duda razonable, las fotografías de las lesiones en el rostro y en el cuello de la perjudicada, los testimonios de sus familiares, de la Policía y del médico así lo establecen. El galeno Rivera se refirió a "múltiples traumas en el cuerpo, moretones y laceraciones en cara y espalda. Rasguños en la cara y estaba hinchada". E.N.P., pág. 8. Sólo haciendo caso omiso a la prueba podemos concluir que estas lesiones fueran producto de relaciones sexuales normales.

Las contradicciones e impresiones resultantes de la prueba de cargo, más que debilitar, refuerzan la sinceridad del testimonio de la perjudicada M.M.S. Al evaluarlo, no podemos pasar por alto su escaso grado de escolaridad, limitaciones naturales producto de un medio ambiental de pobreza y, claro está, las dificultades y reacciones del trauma psicológico por el daño infligido. Este trauma puede generar distintas reacciones y efectos.

En el trasfondo fáctico y procesal del caso de autos, la identificación del apelante Mattei Torres es susceptible de dividirse en dos (2) etapas separadas e independientes. De igual modo sus efectos jurídicos. Veamos.

La *primera*, inmediatamente después de ocurridos los hechos. En la madrugada del viernes 21 de febrero, imposibilitada casi de hablar por los golpes y lesiones referidas, ella le describía el violador a su hermana y al médico que la atendió como "un hombre bajito de pelo negro y gordito". E.N.P.,

pág. 6. Ese mismo día por la noche —en la primera ocasión de ver a su marido Matías después de los hechos— le comunicó que la persona que había estado diciéndole cosas a ella fuera del negocio "El Padrinito", y después peleado con él, era quien había abusado de ella. T.E., págs. 35–37. Esta comunicación, sin necesidad de particularizar los detalles físicos del apelante Mattei Torres, constituyó una descripción *directa, positiva, sencilla* y *contundente*. Goza, además, de la garantía circunstancial de veracidad de haber sido hecha fuera de todo ambiente y control policiaco, y de ser próxima a los sucesos. Su legitimidad y efectividad quedó corroborada al otro día cuando Matías vio y reconoció a Mattei Torres frente a una licorería en la Pda. 26, Santurce, dio cuenta a la Policía y éste fue arrestado.

Esta identificación no puede tacharse de ilegal ni de poco confiable. Por el contrario, bajo el enfoque más exigente —desde el punto de vista de la perjudicada M.M.S., y sobre todo de su esposo Matías, en su carácter dual de observador y participante del incidente de la pelea y receptor subsiguientemente de la comunicación de M.M.S. que vinculaba a Mattei Torres— satisface en forma fidedigna todos los elementos de confiabilidad. En esta identificación inicial, ambos tuvieron amplia oportunidad de observarlo; circunstancialmente prestaron atención; ambos fueron fieles en cuanto a la identidad y certeza de la descripción y, en términos del transcurso del tiempo, sus respectivas observaciones bastante cortas. Más aún, como dijimos en *Pueblo v. Bell Pound*, 101 D.P.R. 41, 44 (1973) —reiterado en *Pueblo v. Rodríguez Maysonet*, supra, pág. 312— "[q]uizás no se encuentre un caso de mayor espontaneidad en la identificación que el caso de autos. La identificación la hicieron los propios perjudicados a iniciativa propia y antes de que se verificara el arresto por los delitos cometidos. . . . En esa etapa todavía no había intervenido la maquinaria policial y, por lo tanto, no

era necesario la asistencia de abogado ni la aplicación de las normas sentadas en *Gómez Incera,* supra".

En resumen, esta identificación anterior a la intervención de la Policía —que condujo al arresto de Mattei Torres— fue espontánea y confiable. Su legalidad es incuestionable. Por ser independiente, no era necesario que el Estado siguiera los métodos previstos en la Regla 252 de Procedimiento Criminal, *supra.*

La *segunda* identificación fue en el Cuartel de la Policía. Según antes reseñado, la perjudicada M.M.S. declaró que en la primera ocasión que le presentaron a Mattei Torres en el cuartel —a dos (2) días de ocurridos los hechos— tuvo dificultad para reconocerlo. Estaba hinchada, tenía los ojos rojos y casi no podía hablar. Las fotografías en evidencia reflejan su delicada condición de salud. Aproximadamente dos (2) semanas después lo identificó. El récord revela que, en esta ocasión, M.M.S. fue un poco imprecisa e insegura, y su hermana Zoraida sugestiva. También revela que uno de los policías le preguntó si lo reconocía. En ambas ocasiones Mattei Torres estaba en una celda solo. Dichas circunstancias sugieren que esta identificación fue poco confiable y que estuvo matizada de alguna sugestividad. Como tal, *por sí sola,* no hubiese sido suficiente para sostener las convicciones. Sin embargo, en vista de la identificación habida previamente —de carácter independiente y ajena al control de la Policía, y no maculada— la cuestión es inconsecuente, máxime ante la identificación que tanto ella como su marido Matías realizaron durante el juicio. *Pueblo v. Rodríguez Maysonet,* supra; *Pueblo v. Rey Marrero,* supra. El error no fue cometido.

### III

*Apreciación y suficiencia de la prueba*

Mattei Torres arguye que no se probó su culpabilidad más allá de duda razonable. A juicio suyo el testimonio de la

perjudicada M.M.S. fue de poco valor probatorio. Tacha de inherentemente increíble e improbable su relato. Sugiere que ella llevaba una vida libertina y que probablemente fue su marido Matías quien la agredió, la golpeó y la dejó cerca del negocio "El Padrinito". Fundamenta su hipótesis en que ella no declaró que fuera amenazada de grave daño ni que el atacante ejerció fuerza irresistible. Como improbable, impugna que el atacante pudiera quitarle los zapatos, pantalones y camisa teniéndola agarrada por el cuello. Cuestiona el aserto de relaciones sexuales *continuas* durante muchas horas y la sodomía. No tiene razón.

No hay prueba para concluir que la perjudicada llevara una vida libertina o promiscua ni podemos inferirlo de las circunstancias sociales. Tampoco podemos concluirlo del dicho de que ella atestiguara que acostumbraba a tomar cervezas, que la noche del suceso estuviera en el cafetín-billar "El Padrinito" donde era conocida y que, además, aceptara que otro hombre le pagara unas cervezas. No existe la más mínima evidencia para inferir que los golpes y sus lesiones fueran causadas por su marido Matías. El argumento es especulativo.

■ Ciertamente, en su testimonio, la perjudicada no utilizó el lenguaje estatutario preciso de que fue amenazada de grave daño ni que la fuerza que ejerció el atacante fue irresistible. No era necesario. El planteamiento confunde los escenarios. Ante el tribunal ella contestó y expuso esos elementos del delito según su limitada educación. Después de todo, no estaba contestando un examen de Derecho Penal en un aula universitaria. A tono con su limitada escolaridad verbalizó la manera en que el apelante Mattei Torres la "jaló por una mano . . . bien duro, un buen bruto" (T.E., pág. 20); que la agarró por el cuello (T.E., pág. 20); que le quitó los *tennis*, pantalones y camisa y la dejó desnuda (T.E., pág. 24); que la mantuvo "agarrá" por el cuello (T.E., pág. 25), esto es, "que

no tenía escapatoria" (T.E., pág. 27); que no podía hablar, pues la "apretó duro por el cuello" (T.E., pág. 30); que le dio puños y golpes en la cara (T.E., págs. 33–34), y que ella se mareó y se quedó inconsciente (T.E., págs. 161–162). Al terminar la agresión quedó con la cara hinchada, llena de sangre y casi no podía hablar. Las fotografías en evidencia y el testimonio del médico corroboran los traumas en su cuerpo, los moretones y las laceraciones en la cara y en el cuello. Ante este tipo de ataque no es difícil entender y aceptar que Mattei Torres pudo efectivamente quitarle los zapatos y la ropa. En cuanto al factor tiempo, basta recordar la naturaleza y violencia de la agresión y que, de "ordinario, para un testigo es sumamente difícil precisar las fechas y las horas". E. Altavilla, *Sicología Judicial* (S. Carrejo y J. Guerrero, trads.), Buenos Aires, Ed. Temis, 1970, Vol. II, pág. 524. Esta dificultad se acentúa en casos de personas objeto de ataques y de abusos sexuales.

■ Finalmente, éste cuestiona que no quedara signo alguno del ataque en la vagina, pubis y ano. A tal efecto se refiere al testimonio del doctor Rivera de que en el examen pélvico no encontró anormalidad visible alguna en la genitalia; el himen tenía laceraciones no recientes; no detectó sangre y secreciones en la vagina, y sólo encontró espermatozoides muertos. E.N.P., pág. 8. Dicho galeno explicó que al examinar la vagina de una mujer que ha sido violada no necesariamente se descubren signos de eritematosis o laceraciones. Dependerá del tiempo en que haya ocurrido la violación y el grado de resistencia ofrecido por la mujer, incluso si ha dejado que el acto ocurra para no ser agredida aún más. Íd. Atestó que la presencia de espermatozoides muertos sólo significa que provienen de una persona infértil o que por el transcurso del tiempo murieron. E.N.P., pág. 10.

Esta prueba no es incompatible con el testimonio de la víctima M.M.S. La premisa en que descansa básicamente el

argumento es errónea: no estamos ante una relación sexual normal y consentida, sino ante una de carácter violento. La credibilidad no puede ser adjudicada a base de razonamientos cuyos parámetros son de normalidad. Ello dispone del apuntamiento de que no se encontraron pelos, sangre o piel en las uñas de la perjudicada M.M.S., aun cuando ella atestó que le tiraba a la cara del atacante para arañarlo y las uñas hacían contacto. T.E., pág. 156. Como cuestión de hecho, el análisis pélvico reveló la presencia de semen, de secreciones vaginales, rectales y en una mancha del mahón. E.N.P., pág. 11.

La prueba desfilada es suficiente y demostró su culpabilidad más allá de duda razonable. El apelante Mattei Torres pretende que sustituyamos la apreciación directa del Jurado, a quien le correspondía aquilatar la prueba. Es obvio que dichos juzgadores le dieron crédito unánimemente a la prueba del Ministerio Fiscal y al testimonio de la perjudicada M.M.S. Con las contradicciones mínimas comprensibles, se mantuvo fiel en cuanto al relato esencial de la traumática experiencia sufrida.(5) En ausencia de prejuicio, parcialidad o error manifiesto, no es nuestra función alterar ese dicta-

---

(5) Como dijimos en *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 726 (1980):

"Toda sociedad tiene sus agresores sexuales. Se ha demostrado la existencia de los siguientes tipos:

"'. . . encontramos entre los casos de violadores al *asaltante agresivo sadista*, para quien la gratificación sexual debe estar precedida, acompañada o seguida de violencia física. Estos hombres odian las mujeres, usualmente actúan solos, frecuentemente usan armas, son indiferentes al atractivo físico de sus víctimas, y muchas veces no pueden culminar el acto sexual. Una segunda variedad es el *delincuente amoral* cuyo concepto de la mujer es aquél de que ella es un mero objeto de placer sexual. Es hedonista, deficiente en sus controles sociales, y no es sadista ni hostil a sus víctimas, aun cuando usará la fuerza para dominar cualquier resistencia. También el *agresor sexual*. El patrón de conducta de estos violadores, bajo influencia del alcohol, [o de alguna otra sustancia] puede variar desde intentos torpes para ganar aceptación de las mujeres, a quienes erróneamente creen amenas, hasta la de aquellos hombres sobre quienes el alcohol tiene el efecto de desencadenar violencia patológica potencial.

men. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Cruz Negrón*, 104 D.P.R. 881 (1976).(6)

## IV

*Negativa del tribunal a admitir el informe de laboratorio y el de la Policía*

■ Este apuntamiento gira en torno a la negativa del foro sentenciador a admitir en evidencia el informe pericial suscrito por la tecnóloga médico Leida Rodríguez Vélez —2 de abril de 1986— y el Informe de Delito Tipo 1 (Núm. 314) preparado por el agente Juan Báez Rivera en la madrugada del viernes 21 de febrero de 1986.

Ambos prestaron testimonio.(7) La testigo Rodríguez Vélez declaró sobre el contenido de su informe y lo identificó. El policía Báez Rivera identificó el suyo.

---

"'La violación es a veces cometida como un acto explosivo por hombres de quien la agresión sexual repentina resulta aparentemente inexplicable, aunque a través de un estudio se revela evidencia psicótica. Existen también aquellos violadores que aplican estándares dobles, diferenciando la mujer buena de la mala, y racionalizando el uso o amenaza de la fuerza, para compeler a la mujer a hacer buena su conducta implícita. (Tales como el haberle aceptado unos tragos, haberse subido en su automóvil, visitado su apartamento, o haberle permitido ciertas libertades con su cuerpo.) Frecuentemente, la violación por este tipo de agresor es una respuesta a lo que interpretan como una conducta provocativa de la mujer. El violador puede también ser un deficiente mental, un psicótico o una mezcla de los tipos antes descritos.' D. MacNamara, *Sex Offenses and Sex Offenders*, 376 Annals of Am. Acad. of Political & Social Science 139, 151–152 (1968). (Traducción nuestra.)" (Énfasis en el original.)

(6) Este error también dispone del señalamiento fundado en la negativa del tribunal a quo a decidir a su favor una moción de absolución perentoria.

(7) Rodríguez Vélez declaró ser tecnóloga médico-forense del Laboratorio del Instituto de Ciencias Forenses, a cargo de serología forense. El instituto es una agencia nueva independiente creada el 1ro de julio. Antes estaba adscrita a la Policía. Una vez cualificada como perito, explicó que a solicitud del agente Carlos J. Díaz realizó unos exámenes de laboratorio sobre la presencia de semen, sangre y un estudio comparativo de pelo con unas manchas de la perjudicada M.M.S. Analizados los *swabs* que contenían secreciones vaginales y rectales, encontró semen. Con una tijera cortó y extrajo un trozo de un pantalón mahón, y bajo examen químico y microscópico encontró semen. Las dos (2) muestras de pelo

El error, aunque no perjudicial, fue cometido. Los dos (2) informes eran admisibles bajo la Regla 65(H) en interacción con la Regla 63 de Evidencia, 32 L.P.R.A. Ap. IV.

La Regla 65(H) de Evidencia, *supra*, dispone —como excepción a la regla de prueba de referencia, *aunque el declarante esté disponible como testigo*— sobre la admisibilidad "de un escrito hecho como récord o informe de un acto, condición o evento, cuando se ofrece para probar el acto, condición o evento, si el escrito fue hecho *en o cerca del momento del acto*, condición o evento, por y dentro del *ámbito del deber de un empleado público*, siempre que las fuentes de información y el método y momento de preparación fueran tales que indican su *confiabilidad*". (Énfasis suplido.)

Esta regla toma como modelo la Sec. 1280 del Código de Evidencia de California. Es menos restrictiva que su contraparte federal, la Regla 803(8). E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia*, San Juan, Pubs. J.T.S.,

---

tenían características similares, esto es, no eran distintos o de otra persona. Las muestras de las uñas estaban "limpiecitas". Así mismo que todo el vello era de ella.

Por su parte, el policía Báez Rivera atestiguó que como a las 5:40 A.M. lo llamaron del Dispensario Belaval para investigar una supuesta violación. Hizo un informe de su intervención y vertió en el mismo lo que le dijo la perjudicada M.M.S.

En lo pertinente consignó:

"Hoy 21 de febrero de 1986 y a las 5:40 A.M. se querelló la joven [M.M.S.], residente en la Calle Olga #141 de Cantera de que mientras caminaba por la Calle Constitución al llegar a la Ave. Barbosa se le acercó un joven *del cual [é]sta no pudo dar descripción* el cual agarrándole por el cuello y bajo amenaza de que [la] mataría la condujo hasta los antiguos almacenes Goya en Cantera donde sostuvo relaciones sexuales con la misma, luego de éste haber satisfecho sus instintos sexuales éste procedió a golpear a dicha joven en distintas partes del cuerpo con los puños resultando [*sic*] ésta con varios [h]ematomas en distintas partes del cuerpo y posible fractura en la mandíbula, siendo atendida en el Dispensario Belaval por el Dr. Salvador Marquex, el cual la refirió a Centro Médico para placas y al Centro de Ayuda a Víctimas de Violación. Se le dio conocimiento a delitos sexuales y el agente Carlos Díaz 11919 se hizo cargo de la investigación." (Énfasis suplido.)

1985, Vol. I, Cap. VIII, pág. 409. Al respecto, *in extenso* éste nos dice:

> . . . [L]a admisibilidad del récord o informe oficial está condicionada a que se satisfagan estos tres requisitos:
>
> 1. el escrito fue hecho por, y dentro del ámbito de los deberes de un funcionario público;
> 2. el escrito fue hecho en o cerca del momento del suceso, acto o condición a que se refiere el mismo;
> 3. la fuente de información, así como el momento y método de preparación del escrito son tales que indican su confiabilidad.
>
> Las limitaciones impuestas por las reglas federales en casos criminales no son aplicables, de suyo, en Puerto Rico, salvo en cuanto ello sea una exigencia del derecho a confrontación bajo la 6[t]a enmienda. Bajo la sección 1280 del Código de Evidencia de California —también libre de las restricciones de la regla federal 803(8)— se ha dicho que lo central es si el récord es confiable (*trustworthy*) y que, además de los requisitos impuestos por el texto de la norma, el récord —para que sea admisible— debe haber sido preparado dentro del deber de un funcionario público, y basado en las observaciones y conocimiento personal de un informante que tenga la obligación de observar e informar. Véase *People v. Flaxman*, 141 Cal. [Rep.] 799, 74 C.A. 3d 16 (1977). La exclusión de informes policiacos y otros de esa naturaleza, contra un acusado, se suele predicar en *falta de confiabilidad (untrustworthiness)*. Véase *People v. Baeske*, 130 Cal. Rep. 35, 58 C.A.[3d] 775 (1976).
>
> La ausencia de precedentes en Puerto Rico nos obliga a ser cautelosos, pero el rechazo de la regla federal 803(8) y la preferencia de la sección 1280 del Código de Evidencia de California, *indica la intención de que sea admisible la mayor prueba de referencia posible, aun contra acusados.*
>
> En casos civiles y en casos criminales *cuando la prueba es ofrecida por la defensa, la regla 65(H) debe ser interpretada liberalmente a favor de la admisibilidad.* En casos criminales cuando la prueba de referencia se ofrezca contra un acusado, el tribunal deberá
>
> 1. examinar el problema de confrontación;
> 2. examinar la admisibilidad de la prueba bajo otras posibles excepciones aplicables;

> 3. examinar rigurosamente si bajo la regla 65(H) se satisfa-
> cen los tres requisitos antes indicados.
>
> Estimamos que como regla general deben admitirse los in-
> formes de autopsia y del químico. *En cuanto a los informes
> policiacos, la situación debe ser examinada caso a caso.* Re-
> cuérdese que el acusado siempre puede llamar al declarante
> (patólogo, químico, policía), como testigo. Si éste no está dis-
> ponible, el problema de confrontación se reduce, bajo la fór-
> mula de *Ohio v. Roberts,* a determinar si se trata de una
> excepción *"deeply rooted"* o si están presentes los indicios cir-
> cunstanciales de confiabilidad. El tipo de informe rutinario —
> correspondiente a la categoría (A) de la regla federal 803(8)—
> debe ser admitido sin mayor dificultad. El informe evaluativo
> o por investigación —categoría (C) de la regla federal
> 803(8)— es el más problemático para que pueda ser admitido
> contra un acusado. En el *"medio"* está el tipo de informe co-
> rrespondiente a la categoría (B) bajo la regla federal. Aquí cae
> el informe de autopsia y, a nuestro juicio, el del químico, con-
> trario a lo estimado en *United States v. Oates,* 560 F.2d [45]
> (1977). (Énfasis suplido, en el original y escolio omitido.)
> Chiesa, *op. cit.,* págs. 418–419.

Aparte de este razonamiento, anotamos que los autores de ambos informes estaban presentes en el juicio y, por ende, sujetos a ser contrainterrogados en cuanto a los mismos. Por vía de la excepción recogida en la Regla 63 de Evidencia, *supra,* estos documentos eran admisibles.

Sin embargo, aunque el foro de instancia erró al no admitirlos, la infracción no fue perjudicial.

Respecto al informe pericial, su carácter acumulativo y corroborativo es aceptado por el propio apelante Mattei Torres. Su contenido fue al Jurado por voz de su autora la tecnóloga Rodríguez Vélez.

En cuanto al informe del policía Báez Rivera, advertimos que éste fue presentado como testigo de la propia defensa. En ese momento tuvo amplia oportunidad para preguntarle sobre todo su contenido, incluso lo que le informó la perjudicada M.M.S. la madrugada de los hechos. Un examen del

mismo refleja que lo único beneficioso a su interés era acreditar ante el Jurado que ella, a las 5:40 A.M., "no pudo dar descripción" del atacante al agente y así poner en entredicho su veracidad.

La dificultad de este argumento es que ni el Ministerio Fiscal ni la defensa inquirieron a la perjudicada M.M.S. sobre la descripción, si alguna, brindada a las autoridades policiacas. Ello es perfectamente comprensible si recordamos que la misma fue canalizada a través de su hermana Zoraida y su esposo Matías, quienes identificaron al agresor Mattei Torres.

El hecho de que a esa hora no suministrara al agente Báez Rivera una descripción no afecta totalmente su credibilidad. Los estudios sugieren que los síntomas de miedo y de ansiedad subsisten después de la violación y "la Policía no debe esperar que las víctimas produzcan una declaración completa y certera a pocas horas del crimen. El demorar hasta el otro día el interrogatorio completo, cuando la ansiedad de la víctima ha disminuido sería algo más humano y productivo. Es de esperarse que las víctimas recuerden más, a medida que disminuye su ansiedad". (Traducción nuestra.) Resick, *supra.*, pág. 58.

En esas circunstancias el efecto de excluir el informe no fue un factor decisivo o sustancial en el veredicto unánime. *Pueblo v. Lebrón González*, supra, pág. 102; *Pueblo v. Franceschini Sáez*, 110 D.P.R. 794, 799 (1981); Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV (3 P.F.P. pág. 16).

## V

*Instrucciones especiales al Jurado*

Mattei Torres cuestiona ante nos la negativa del tribunal de instancia a brindar al Jurado una instrucción especial, específica y vital, relativa a "manifestaciones (más bien omi-

siones) anteriores de la testigo principal de cargo". Dicho foro estimó que habían sido incluidas con sus instrucciones bajo el tema de "Declaraciones o Manifestaciones Anteriores del Testigo", contenidas en el *Manual de Instrucciones al Jurado*, aprobado por el Tribunal Supremo de Puerto Rico, 27 de marzo de 1980, pág. 6. La queja es inmeritoria.

■ Primero, el argumento reconoce implícitamente la suficiencia de las instrucciones. Simplemente considera que las brindadas carecían del énfasis necesario. Segundo, una de las características que de ordinario debe poseer y proyectar toda instrucción es que sea balanceada, clara, directa y no repetitiva. La solicitada no cumplía con estas características. Y tercero, las instrucciones del referido *manual* responden a esa visión y, aunque no son obligatorias, seguirlas en circunstancias normales constituye "la mejor práctica" —*Pueblo v. Mangual Hernández*, 111 D.P.R. 136, 146 (1981)— pues, están cobijadas de una presunción de corrección. *Pueblo v. Ortiz González*, 111 D.P.R. 408, 410 (1981).

En cuanto a la otra instrucción especial solicitada y también negada, el apelante Mattei Torres admite que el tribunal de instancia tuvo "razón al denegar[la]". Alegato, pág. 41.

## VI

*Decreto de delincuente habitual*

Finalmente, Mattei Torres impugna el decreto de *delincuente habitual*. Aduce que no se siguió el procedimiento establecido en los Arts. 68 y 69 del Código Penal "previo a la imposición de una medida de seguridad de esta naturaleza", a saber, un informe psiquiátrico o psicológico por un perito y un informe social de un oficial probatorio, con derecho a las partes a controvertirlos en una vista. 33 L.P.R.A. secs. 3353 y 3354. Todo su razonamiento está predicado en la premisa

mayor de que estos artículos están "indisolublemente ligados al artículo 74 del mismo cuerpo legal". Tampoco le asiste la razón. Veamos.

El Art. 74 del Código Penal —según enmendado por la Ley Núm. 101 de 4 de junio de 1980— que gobierna la solución disponía:

> El convicto de delito grave que anteriormente hubiere sido sentenciado por dos o más delitos graves cometidos en tiempos diversos e independientes unos de otros, *se presume que demuestra una persistente tendencia a delinquir, y será declarado por el tribunal delincuente habitual y recluido para su tratamiento* por un término fijo que no será nunca menor de veinte (20) años ni mayor de noventa y nueve (99) años. El término fijo que se imponga será siempre en años naturales. (Énfasis suplido.) 33 L.P.R.A. ant. sec. 3375.

■ Su historial y antecedente legislativo es sumamente revelador. Su texto primitivo fue situado en el capítulo del Código Penal correspondiente a las medidas de seguridad, en atención a que fue concebido de manera mixta, esto es, contentiva de algunos elementos de una medida de *seguridad* y *punitiva de reincidencia*. Ley Núm. 115 de 22 de julio de 1974 (33 L.P.R.A. sec. 3001 *et seq.*). Ello explica por qué el Art. 67 disponía que la "aplicación de las medidas de seguridad excluyen la pena, *salvo en el caso del delincuente habitual*". (Énfasis suplido.) 33 L.P.R.A. sec. 3352. En resumen, ante un delincuente habitual —además de aplicar una medida de seguridad— el tribunal venía obligado originalmente a imponerle la sanción punitiva agravada dispuesta por el estatuto.

Por su parte, sabemos que ninguno de los articulados relativos a las medidas de seguridad tuvieron vigencia inmediata, sino un (1) año después. Subsiguientemente fueron prorrogados por dos (2) años más. Ley Núm. 146 de 3 de julio de 1975 (33 L.P.R.A. sec. 4628).

En ese estado de suspensión, la Asamblea Legislativa optó en 1975 por poner en vigor la figura del delincuente

habitual, *pero únicamente como una medida punitiva de reincidencia, con excepción de los elementos de seguridad.* A tal efecto, la Ley Núm. 10 de 1ro de diciembre de 1975 modificó el concepto y alcance del delincuente habitual y decretó la vigencia inmediata de los Arts. 66, 67, 68, 69, 75 y 76 del Código Penal, 33 L.P.R.A. secs. 3351-3354, 3391 y 3392, pero *solamente* en cuanto al delincuente habitual.(8)

Con posterioridad, la Ley Núm. 26 de 25 de septiembre de 1983 (33 L.P.R.A. sec. 4628) prescribió que los Arts. 66 al 69 del Código Penal, *supra* —normas generales aplicables a todas las medidas de seguridad— entrarían en vigor el 22 de septiembre de 1984. El Art. 71 del Código Penal, 33 L.P.R.A. sec. 3372, cubre la medida específica de los alcohólicos, dependientes o adictos. Este mandato no incluyó el Art. 74 del Código Penal, *supra*, que según hemos expresado, es una medida punitiva de reincidencia y no de seguridad. Los restantes preceptos relativos a las medidas de seguridad —delincuente sexual peligroso y delincuente compulsivo, Arts. 72 y 73 del Código Penal, 33 L.P.R.A. secs. 3373 y 3374— entrarán en vigor el 22 de julio de 1988.

Esta cronología legislativa derrota la contención de Mattei Torres. Los Arts. 68 y 69 del Código Penal, *supra*, únicamente operan como *suplemento* a las medidas de segu-

---

(8) Su Exposición de Motivos plasma la preocupación de la Legislatura por el incremento en la criminalidad y las estadísticas demostrativas de que había aumentado el número de convictos con antecedentes penales de tres (3) o más convicciones por delitos graves. Se estimó que estas personas que demostraban "una persistente tendencia a delinquir" debían ser separadas permanentemente de la sociedad. En lo pertinente, la Sec. 5 dispuso:

"Esta ley comenzará a regir a los 90 días después de su aprobación. No empece lo dispuesto en el Artículo 284 de la Ley Núm. 115 de 22 de julio de 1974, Código Penal de Puerto Rico, respecto a la vigencia de los Artículos 66 al 76 sobre medidas de seguridad, *para los efectos exclusivos de la implementación, y de la aplicación de las medidas de seguridad al delincuente habitual, los Artículos 66, 67, 68, 69, 74, 75, 76 de dicho Código entrarán en vigor a los 90 días después de la aprobación de la presente medida.* (Énfasis suplido y escolios omitidos.) 1975 Leyes de Puerto Rico 1048, 1051.

ridad vigentes que no tienen substancialidad propia. El Art. 74 del Código Penal, *supra*, no es una medida de seguridad, sino una de carácter punitivo que opera a modo de reincidencia con relación al delincuente habitual. En consecuencia, aceptadas por Mattei Torres las sentencias previas, no erró el tribunal sentenciador al declararlo delincuente habitual sin el peritaje e informes a que se refiere el Art. 68 del Código Penal, *supra*.

La perfección es atributo exclusivo del Sumo Hacedor. "Hay que recordar que todo acusado tiene derecho a un juicio justo, que no significa necesariamente un juicio perfecto." *Pueblo v. Díaz Ríos*, 107 D.P.R. 140, 143 (1978). El apelante Mattei Torres no puede reclamarnos ese tipo de juicio. Algún día ante el Foro Divino tendrá esa oportunidad. Por lo pronto, es suficiente el juicio justo e imparcial a que fue sometido.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Hernández Denton está conforme con la opinión, excepto que disiente de la parte VI sin opinión escrita. El Juez Asociado Señor Rebollo López disiente sin opinión escrita.