# 2001 DTA 115

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL V DE PONCE Y AIBONITO**

EL PUEBLO DE PUERTO RICO
Peticionario

v.

JOSE JULIAN CRUZ BERRIOS
Recurrido

Núm. KLCE-01-00031

San Juan, Puerto Rico, a 7 de febrero de 2001

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Ortiz Carrión y la Juez Pabón Charneco

Brau Ramírez, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

## I

El Procurador General de Puerto Rico recurre de una resolución emitida el 5 de diciembre de 2000 por el Tribunal de Primera Instancia, Sala Superior de Aibonito, en el procedimiento criminal que se ventila ante dicho

foro contra el recurrido, José Julián Cruz Berríos, por los delitos de robo, 33 L.P.R.A. sec. 4279 (Supl. 2000), y violación al art. 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 418, por portación ilegal de armas.

Mediante el dictamen en cuestión, el Tribunal de Primera Instancia ordenó la supresión del testimonio sobre la identificación del recurrido ofrecido por la víctima de los delitos, al estimar que el testigo no merecía credibilidad.

El 12 de enero de 2001, concedimos término al recurrido para que compareciera a mostrar causa por la cual no debíamos expedir el auto solicitado y revocar la resolución recurrida. El recurrido ha comparecido por escrito.

Procedemos según lo intimado.

## II

Según se desprende del recurso, en septiembre de 1999, las autoridades presentaron denuncias contra el recurrido ante el Tribunal de Primera Instancia, por hechos alegadamente ocurridos en horas de la noche del 26 de agosto de 1999, en el Barrio Helechal de Barranquitas. Esa noche, en unión a dos individuos, el recurrido supuestamente asaltó a Antonio Ortiz Burgos, al frente de la casa de éste. Los asaltantes penetraron a la casa, donde estaban otras personas, y se apropiaron de varios objetos. Alegadamente, los tres asaltantes estaban armados.

Como resultado de estos hechos, el recurrido fue denunciado por dos cargos de robo, 33 L.P.R.A. sec. 4279 (Supl. 2000), dos cargos por violación al art. 6 de la Ley de Armas, 25 L.P.R.A. sec. 416, por posesión ilegal, y tres cargos por violación al art. 8 de la misma Ley, 25 L.P.R.A. sec. 418, por portación ilegal de armas.

Luego de otros incidentes, la vista preliminar se celebró el 4 de enero de 2000. Como testigo principal del Ministerio Público, declaró el Sr. Ortiz Burgos.

Conforme se expone en la comparecencia del recurrido, la versión de los hechos expresada por el Sr. Ortiz Burgos fue la siguiente:

El Sr. Ortiz declaró que el día de los hechos, 26 de agosto de 1999, a eso de las 8:00 p.m., había ido con su esposa a la casa de un vecino. Este los había llamado para decirles que en horas de la tarde había visto un Ford Taurus, blanco, de cuatro puertas, sospechoso, que había pasado por el lugar donde ellos residen.

Mientras estaban hablando, el Sr. Ortiz vio pasar el carro que le habían descrito, el cual iba subiendo. Le comentó a su vecino que el mismo era de la policía, ya que tenía tablilla amarilla. El testigo decidió regresar a su casa con su esposa, ya que había dejado a su hija allí con una amiga y las jóvenes estaban solas. Cuando iban subiendo por la carretera hacia la residencia, el automóvil Ford Taurus bajó y "*casi se paró*" con ellos.

A la vez que el testigo y su esposa llegaron a la casa, vinieron a buscar a la amiga de su hija, la cual se fue. En ese momento, también llegó llegó el hijo del testigo, llamado Anthony, en un automóvil Mirage, acompañado de un sobrino del testigo,

El sobrino dejó a su hijo y se fue en el Mirage. Cuando el testigo estaba en el balcón de la casa con su hijo Anthony, su esposa y su hija, el Ford Taurus volvió a bajar. En esta ocasión, el automóvil Ford Taurus se detuvo frente al portón de la casa del testigo.

El testigo salió hacia el portón para cerrarlo y "*a la misma vez, cuando se paró el carro, con el propósito de preguntar qué querían*", el testigo cerró el portón y las personas que iban en el Ford lo llaman por "*Toño*".

El automóvil tenía los cristales ahumados y el conductor bajó el cristal como cuatro o cinco pulgadas. El testigo se dirigió al chofer. Cuando se va acercando al cristal, el conductor sube el cristal y se bajó la persona del

lado del pasajero del frente. Le preguntaron que si el era "*Toño*" y si Anthony estaba allí. El testigo le dijo a su hijo que lo estaban buscando y que fuera donde él estaba.

Cuando su hijo venía, el testigo se movió hacia el frente del automóvil. Cuando iba llegando a la esquina del bonete, se bajó el pasajero y le dio un "*cantazo*" con un revólver y le indicó que se tirara al piso, que se trataba de un asalto. La persona tenía la cara cubierta con una media de "*nylon*".

Lo tiraron al piso y le rebuscaron los bolsillos. En eso, el conductor tiró a su hijo Anthony al lado de él. Les dijeron que se callaran la boca y que les entregaran el dinero que tuvieran, que si levantaban la cabeza los iban a matar. El testigo trató de levantar la cabeza y le dieron dos "*cantazos*", le enterraron los dientes en la brea para que no se levantara.

Continuaban diciéndoles que si no estregaban todo el dinero que tenían, los iban a matar junto con su esposa e hija. Su esposa salió hacia donde estaban ellos. Del automóvil salió una persona con careta y la cogió a mitad del camino y se la llevó para arriba. Además se llevaron a su hija hacia arriba.

Dos de los asaltantes se quedaron con él y su hijo, quienes estaban abajo, mientras que el otro entró a la casa con su esposa e hija. Entonces se llevaron a su hijo hacia la casa y mantuvieron al testigo acostado en la carretera mientras le ponían los pies encima.

Después de diez a quince minutos, los asaltantes regresaron por el testigo y lo llevaron a la casa. Los tiraron en el pasillo. La esposa le dijo al testigo que le diera más dinero a las personas y que había $2,000.00 encima de la coqueta del cuarto de matrimonio. Una de las personas brincó para buscar el dinero.

La persona que tenía la media sobre su cara, se dirigió hacia ellos donde los tenía en el pasillo y comenzó a buscar en la nevera. Hasta estos momentos, el testigo desconocía quién era esta persona.

El testigo declaró que vio por fracciones de segundos el rostro de esta persona cuando prendió la luz de la nevera. Subió un carro por la carretera y las personas los amarraron con "*tape*" gris y se llevaron varias cosas. Cuando se iban, les dijeron que no levantaran la cabeza. Cortaron el teléfono y se fueron.

El testigo le dijo a sus familiares que esperaron como cinco o seis minutos y él fue el primero en soltarse y luego soltó a los demás. Le dijo a su hijo que fuera a buscar ayuda y llamaron a la policía desde la casa de su hermana, quien es vecina. La hermana fue quien llamó a la policía, ya que el testigo estaba muy nervioso.

El testigo manifestó que no podía decir nada de la persona que iba guiando, ya que tenía una careta negra. Cuando llegó la policía, describió al que tenía la media en la cabeza como gordo, grande, alto, con barba, y el otro que tenía la careta negra, lo identificó como bajito de pantalones cortos, flaco.

De primera intención, no le dijo a la policía quién era la persona a quien le había visto el rostro cuando abrió la nevera. Varios días después del incidente, identificó a esta persona como el recurrido.

A base de esta declaración, el Tribunal determinó que existía causa para arrestar al recurrido por los dos cargos de robo y dos de los tres cargos de violación al art. 8 de la Ley de Armas. Determinó la inexistencia de causa para acusar con relación a los dos cargos por violación al art. 6 de la Ley de Armas y el cargo restante por violación al art. 8 de la Ley de Armas.

El caso fue señalado para la continuación de los trámites, para los cuales el Sr. Ortiz quedó citado como testigo del Pueblo.

El Ministerio Público solicitó una vista en alzada de la porción de la determinación del Tribunal que le había sido negativa, conforme lo autoriza la Regla 24 (c) de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 24

(c).

Así las cosas, el 3 de febrero de 2000, el recurrido presentó una moción solicitando la supresión del testimonio del Sr. Ortiz Burgos en el procedimiento.

En su moción, el recurrido alegó que su identificación por el Sr. Ortiz debía ser suprimida porque el testimonio de esta parte no resultaba confiable, ni creíble. No expresó, sin embargo, que los agentes del orden público hubieran participado en el proceso de identificar al recurrido, ni expuso hechos específicos que tendieran a viciar la misma, más allá de la falta de credibilidad atribuida al declarante.

El Ministerio Público se opuso a la moción del recurrido. El Tribunal de Primera Instancia señaló una vista para la consideración de la moción, la que fue consolidada con la vista preliminar en alzada.

La vista en cuestión fue celebrada el 5 de diciembre de 2000. Luego de escuchar el testimonio del Sr. Ortiz, el foro de Primera Instancia resolvió que no existía causa para acusar al recurrido por los cargos pretendidos en la vista en alzada. Además, mediante resolución emitida en esa fecha, ordenó la supresión de la identificación del recurrido.

En su resolución, la distinguida Sala recurrida concluyó que el testimonio sobre la identificación del recurrido debía ser suprimido porque el mismo no era confiable. Observó que:

*"La víctima tuvo poca oportunidad para observar a sus asaltantes. Testificó en la vista que la primera y única oportunidad de ver al acusado fue cuando, estando boca abajo en el piso, levantó la cabeza y observó al acusado por la luz de la nevera que éste alegadamente había abierto. Las luces de la casa estaban apagadas y la víctima subió y bajó la cabeza enseguida. Aparte de esta observación, estimada por las partes en segundos, los asaltantes todos, vestían una media de nilón sobre la cara, aun al momento de la observación en la nevera.*

*Si bien la víctima alegó reconocer al acusado al éste abrir la nevera, lo cierto es que no se lo informa a los agentes que investigaron el asalto, el mismo día que ocurrió.*

*No es sino en entrevistas posteriores que la víctima informa haber reconocido al aquí acusado como uno de los asaltantes."*

En consideración a estos factores, el Tribunal optó por ordenar la supresión de la evidencia.

Insatisfecho, el Procurador General acudió ante este Tribunal.

## III

En su recurso, el Procurador General plantea que incidió el Tribunal de Primera Instancia al declarar con lugar la moción de supresión presentada por el recurrido.

Según se conoce, para establecer la culpabilidad de un acusado por un delito, es necesario, no sólo que se presente prueba sobre los elementos del delito imputado, sino que se identifique al acusado como el autor del mismo. *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302, 309 (1987); *Pueblo v. Gómez Incera*, 97 D.P.R. 249, 251-252 (1969).

De ordinario, corresponde al jurado pasar juicio sobre estos elementos. *Pueblo v. Torres Rivera*, 137 D.P.R. 630, 638 (1994); *Pueblo v. Bonilla Romero*, 120 D.P.R. 92, 111 (1987); *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 648 (1986); véase, además, *Pueblo v. Lebrón Bones*, 110 D.P.R. 780, 781 (1981).

Ahora bien, cuando la identificación del acusado ha sido obtenida mediante un procedimiento sugestivo, el Tribunal Supremo de Puerto Rico ha resuelto que ello constituye una violación a la garantía constitucional al

debido proceso de ley, *Pueblo v. Ramos y Alvárez*, 122 D.P.R. 287, 311 (1988); *Pueblo v. Gómez Incera*, 97 D.P. R. __, a las págs. 251-252; véanse, además, *United States v. Wade*, 388 U.S. 218 (1967); *Gilbert v. California*, 388 U.S. 263 (1967) y *Stovall v. Denno*, 388 U.S. 293 (1967).

Este tipo de evidencia resulta excluible del juicio, pudiendo solicitarse su supresión. Véanse, *United States v. Wade*, 388 U.S. a las págs. 239-241; *Gilbert v. California*, 388 U.S. a la pág. 272; véase, además, *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980).

En aqüellos casos en que el perjudicado o testigos de la comisión de un delito no conocen personalmente al sospechoso, el Tribunal Supremo de Puerto Rico ha establecido que el procedimiento más aconsejable a seguirse es el de la celebración de una rueda de detenidos ("*line up*"). *Pueblo v. Robledo*, 127 D.P.R. 964, 968 (1991); *Pueblo v. Montañez Ramos*, 100 D.P.R. 911, 915 (1972); 34 L.P.R.A. Ap. II, R. 252.

Ahora bien, el hecho de que no se siga este procedimiento, no tiene el efecto de automáticamente viciar la identificación o hacerla inadmisible. *Pueblo v. Robledo*, 127 D.P.R. __, a la pág. 968; *Pueblo v. Ortiz Pérez*, 123 D.P.R. 216, 223 (1989); *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 822-823 (1983); *Pueblo v. Rivera Navarro*, 113 D.P.R. 642, 649-652 (1982).

La determinación depende, más bien, de la totalidad de las circunstancias. *Pueblo v. Torres Rivera*, 137 D.P. R. __, a la pág. 637; *Pueblo v. Torres Ramos*, 121 D.P.R. 747, 751 (1988). Lo importante es que la identificación sea "*libre, espontánea y confiable.*" *Pueblo v. Ramos y Alvarez*, 122 D.P.R. __, a la pág. 312; *Pueblo v. Peterson Pietersz*, 107 D.P.R. 172, 183-184 (1978).

Para evaluar la confiabilidad de la identificación, deben considerarse los siguientes criterios: (1) la oportunidad que tuvo el testigo de observar al acusado en el momento en que ocurre el acto delictivo, (2) el grado de atención del testigo, (3) la corrección de la descripción, (4) el nivel de certeza en la identificación, y (5) el tiempo transcurrido entre el crimen y la confrontación. Véanse, *Pueblo v. Torres Rivera*, 137 D.P.R. __, a la pág. 637; *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 608 (1988); *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. __, a las págs. 309-310; *Pueblo v. Peterson Pietersz*, 107 D.P.R. __, a la pág. 183; véanse, además, *Neil v. Biggers*, 409 U. S. 188 (1972) y *Manson v. Brathwaite*, 432 U.S. 98 (1977); Ernesto Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos,* Vol. I, Editorial Forum, 1991, a las págs. 266-267.

Es importante señalar, sin embargo, que este análisis es más bien procedente cuando la prueba de identificación ha estado maculada por elementos de sugestividad provocados por las actuaciones de los funcionarios del Estado. Cuando ello no ocurre, no existe infracción alguna a los derechos del acusado que justifique la intervención del Juez para privar al jurado de su función de adjudicar la prueba. Véase, *Pueblo v. Mattei Torres*, 121 D.P.R. __, a la pág. 608; *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. __, a la pág. 313; *Pueblo v. García Reyes*, 113 D.P.R. 843, 848 (1983).

Cuando el procedimiento no ha estado viciado de sugestividad, corresponde al jurado adjudicar la credibilidad de los testigos. *Pueblo v. Torres Rivera*, 137 D.P.R. __, a la pág. 638; *Pueblo v. Rodríguez Román*, 128 D.P.R. 121, 127-129 (1991). Según ha observado el Tribunal Supremo de Puerto Rico:

"*[P]rueba con algún elemento indigno de confianza, es grano de todos los días para el molino del jurado. Los jurados no son tan susceptibles que no puedan evaluar inteligentemente el peso de un testimonio de identificación.*"

*Pueblo v. Peterson Pietersz*, 107 D.P.R. a la pág. 184 (citando a *Manson v. Brathwaite*, 432 U.S. a la pág. 116).

En la situación de autos, la moción de supresión presentada por el recurrido no exponía elemento alguno de sugestividad en el testimonio del Sr. Ortiz provocado por los agentes del Estado, que justificara al Tribunal a

intervenir y excluir el mismo de la consideración del jurado con antelación al juicio. La función de adjudicar la credibilidad de dicho testimonio no correspondía al foro de Primera Instancia, ni estaba autorizado éste a usurpar la función reservada para el jurado.

Por los fundamentos expresados, se emite el auto y se revoca la resolución recurrida. En su lugar, se devolverá el caso al Tribunal de Primera Instancia para procedimientos consistentes con esta sentencia.

Lo pronunció y manda el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General