ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI-ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>NATALIA MARILIA PACHECO MADERA<br><br>Apelante | KLAN202300139 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: D LE2021G00117<br><br>Sobre: Art. 2.8 Ley 54-1989 |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez Adames Soto y la Jueza Martínez Cordero.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 17 de noviembre de 2023.

Comparece Natalia Marilia Pacheco Madera (en adelante, Pacheco Madera y/o apelante) para solicitarnos la revisión de la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, TPI) el 23 de enero de 2023, notificada el 8 de febrero de 2023. Mediante el dictamen apelado, el foro primario dictó un fallo de culpabilidad con atenuantes por una infracción al Artículo 2.8 de la Ley para la Prevención e Intervención con la Violencia Doméstica (en adelante, Ley Núm. 54-1989)[1] y refirió el caso a informe pre-sentencia. El tribunal apelado sentenció a Pacheco Madera a cumplir una condena de seis (6) años de reclusión bajo el régimen de sentencia suspendida. Como parte de la *Sentencia* dictada se le impuso supervisión electrónica por el término total de su sentencia.

---

[1] Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, según enmendada, Art. 2.8, 8 LPRA § 628.

Número Identificador

SEN2023_____

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

**I**

Por hechos alegadamente ocurridos el 29 de abril de 2021, se presentó una *Denuncia* contra Pacheco Madera el 30 de abril de 2021. Sobre esta, el tribunal *a quo* determinó causa probable y se le fijó una fianza de $15,000.00 dólares, la cual logró prestar a través de un fiador privado.  Además, se le impuso la condición de supervisión electrónica.

El 2 de julio de 2021, se celebró la Vista Preliminar al amparo de la Regla 23 de Reglas de Procedimiento Criminal.[2] Producto de esta vista, se determinó que existía causa probable para creer que Pacheco Madera había cometido el delito de infracción al Artículo 2.8 de la Ley Núm. 54-1989.[3]

De ahí, el 9 de julio de 2021, se presentó una *Acusación* por delito grave contra Pacheco Madera por infracción al Artículo 2.8 de la Ley Núm. 54-1989.[4] En la *Acusación* se expuso que, Pacheco Madera de forma ilegal, voluntaria, a propósito, y criminalmente violentó a sabiendas las prohibiciones estipuladas en la *Orden de Protección* (en adelante, *Orden*) número 2021-012266 a favor de Gustavo Raphael Vélez Vega (en adelante, Vélez Vega), con quien sostuvo una relación consensual. Dicha *Orden* había sido expedida de conformidad con la Ley Núm. 54-1989 el 28 de abril de 2021, con vigencia hasta el 18 de mayo de 2021. Los hechos consistían en que Pacheco Madera le envió mensajes de texto y de voz, realizó llamadas a Vélez Vega y luego se personó en la residencia de la abuela de Vélez Vega donde este residía.

---

[2] 34 LPRA Ap. II, R. 23.
[3] Art. 2.8, 8 LPRA § 628.
[4] *Id.*

Así las cosas, el 28 de junio de 2022, se celebró el *Juicio en su Fondo* (en adelante, *Juicio*) por tribunal de derecho, luego de que Pacheco Madera renunciara al derecho a juicio por jurado. Durante el *Juicio*, el Ministerio Público (en adelante, Ministerio) presentó como prueba de cargo a los siguientes cinco (5) testigos: (i) Agente Ernesto De Jesús Centeno (en adelante, Agente De Jesús), agente investigador de la querella perteneciente a la División de Violencia Doméstica en Bayamón; (ii) Agente Fernando Morales Canales (en adelante, Agente Morales), agente de la División de Crímenes Cibernéticos; (iii) Vélez Vega; (iv) Agente Wilson Nieves Hernández (en adelante, Agente Nieves), agente que diligenció la *Orden*; y, (v) Agente Wildamar O' Neil Reyes (en adelante, Agente O' Neil), agente que atendió la querella. Por su parte, la prueba documental del Ministerio consistió en los siguientes cinco (5) documentos: (i) Consentimiento de Registro de la División de Crímenes Cibernéticos estipulado y marcado como Exhibit 1[5]; (ii) Informe de Evidencia Digital de la División de Crímenes Cibernéticos estipulado y marcado como Exhibit 2[6]; (iii) CD estipulado y marcado como Exhibit 3[7]; (iv) *Orden* marcada como Identificación 1 y luego como Exhibit 4[8]; y, (v) Advertencias de Ley marcada como Identificación 2 y luego como Exhibit 5[9]. Comenzado el *Juicio*, Pacheco Madera hizo alegación de no culpabilidad, en relación con el Artículo 2.8 de la Ley Núm. 54-1989.[10]

Para un cabal entendimiento, incluimos un resumen de la prueba testifical oral que se desfiló ante el foro primario y que este Panel examinó cuidadosamente.

---

[5] En la Transcripción Estipulada de la Prueba Oral (en adelante, TPO) pág. 74, líneas 6-11.
[6] *Id.,* pág. 74, línea 20.
[7] *Id.,* pág. 75, líneas 7-8.
[8] *Id.,* pág. 108, líneas 13-19; pág. 109, líneas 2-3; y, pág. 110, líneas 17-18.
[9] *Id.,* pág. 191, línea 2 y 24 y pág. 195, línea 3.
[10] Art. 2.8, 8 LPRA § 628. En la TPO pág. 8, líneas 6-10.

El primer testigo que presentó el Ministerio fue al **Agente De Jesús**.[11] En el examen directo realizado por el Ministerio testificó que su participación consistió en hacerle preguntas a Vélez Vega, quien le narró lo sucedido que motivó la presentación de la querella.[12] Continuó declarando que Vélez Vega le manifestó que luego de haber solicitado la *Orden*, Pacheco Madera comenzó a enviarle sobre cuarenta mensajes a través de WhatsApp y a hacerle sobre veinte llamadas telefónicas desde las 12:07 a.m. hasta las 9:30 a.m. del 29 de abril de 2021.[13] Respecto a los mensajes, testificó que Vélez Vega le manifestó que Pacheco Madera le escribió que quería hablar con él, que no le hiciera lo de la *Orden* ya que la podían meter presa y perder su casa y carro, que lo amaba y que la llamara.[14] En lo que a las llamadas respecta, testificó que surgieron del número de teléfono por el cual ella se comunicaba con él durante sus diez (10) meses de relación, pero que Vélez Vega le manifestó que no las contestó.[15] Por su parte, testificó que Vélez Vega le manifestó que ese mismo día, o sea el 29 de abril de 2021, alrededor de las 8:30 a.m. Pacheco Madera llegó a la residencia de su abuela y le dijo que quería hablar con él, pero que él le dijo que no podían hablar.[16] A raíz de ello, Vélez Vega le manifestó al Agente De Jesús que procedió a llamar a la Policía de Puerto Rico (en adelante, policía) para hacer una querella, junto a su abuela.[17] Luego de eso, testificó que Vélez Vega le manifestó que Pacheco Madera le envió unos mensajes de texto indicando que estaba en el cuartel y la iban a arrestar.[18] Terminando de testificar lo antes mencionado, **el**

---

[11] En la TPO pág. 9, línea 2.
[12] *Id.,* pág. 11, líneas 9-11.
[13] *Id.,* pág. 13, líneas 15-19 y pág. 14, líneas 1-2 y 10-12.
[14] *Id.,* pág. 14, líneas 2-6.
[15] *Id.,* pág. 14, 15-19 y pág. 15, línea 14.
[16] *Id.,* pág. 15, líneas 18-19 y pág. 16, líneas 3-5.
[17] *Id.,* pág. 16, líneas 5-7 y pág. 17, líneas 6-8.
[18] *Id.,* pág. 16, líneas 8-10.

**Agente De Jesús identificó a Pacheco Madera en sala**.[19] (Énfasis suplido).

Finalizado el examen directo al Agente De Jesús, comenzó su contrainterrogatorio por parte de la representación legal de Pacheco Madera (en adelante, la Defensa). Testificó el Agente De Jesús que, ya a las 10:00 a.m. del 29 de abril de 2021, Pacheco Madera estaba arrestada.[20] Además, testificó que ese mismo día Pacheco Madera, ya para las 10:38 a.m., había sido llevada al hospital de Cataño.[21] Respecto a este incidente, continuó testificando que Pacheco Madera fue atendida en el hospital debido a que fue agredida y tenía varios moretones.[22] Aclaró el Agente De Jesús que, cuando llevaron a Pacheco Madera al hospital, ya se encontraba en su custodia.[23] Entonces, la Defensa utilizando el récord médico de Pacheco Madera le preguntó al Agente De Jesús si ahí decía que, además de moretones esta tenía mordidas, lo cual este confirmó.[24] Ante objeciones presentadas por el Ministerio, el juez le aclaró a la Defensa que se encontraban ante una 2.8[25], la cual no es para cuestionar la validez de la *Orden.*[26] Respecto a si Vélez Vega tenía marcas debido al incidente, testificó que este le dijo que sí, y él las pudo observar, pero que no tomó notas ni lo colocó en el reporte.[27]

Concluido el contrainterrogatorio, comenzó el examen redirecto por parte del Ministerio al Agente De Jesús. Testificó que pudo observar marcas visibles en los brazos de Vélez Vega.[28] A preguntas sobre cuando llevó a Pacheco Madera al hospital, testificó que fue llevada una sola vez debido a que estaba auto agrediéndose

---

[19] *Id.,* pág. 16, líneas 19-22.
[20] *Id.,* pág. 21, líneas 2-9.
[21] *Id.,* pág. 27, líneas 16-20, 25 y pág. 28, líneas 1-2, 14-15.
[22] *Id.,* pág. 28, líneas 16-19.
[23] *Id.,* pág. 29, líneas 21-24.
[24] *Id.,* pág. 30, líneas 5-8.
[25] Art. 2.8, 8 LPRA § 628.
[26] En la TPO pág. 32, líneas 10-12.
[27] *Id.,* pág. 34, líneas 10-14.
[28] *Id.,* pág. 46, líneas 9-19.

en la celda con los tubos y los barrotes.[29] En el segundo contrainterrogatorio por parte de la Defensa, en cambio, el Agente De Jesús testificó que habían llevado a Pacheco Madera al hospital en horas de la noche, luego de las 6:30 p.m.[30]

Excusado el Agente De Jesús, comenzó el examen directo al Agente Morales por parte del Ministerio. Comenzó testificando que fue el Agente De Jesús quien fue a solicitar los servicios de la División de Crímenes Cibernéticos. Ante la solicitud, testificó que el 21 de julio de 2021, procedieron a sacar un video de los mensajes de WhatsApp del teléfono de Vélez Vega. Explicó que sacaron un video debido a que era extenso.[31]

Finalizado el examen directo, comenzó el contrainterrogatorio por parte de la Defensa al Agente Morales. Testificó que no tenía en su custodia una certificación oficial de la red social WhatsApp que dijera que los mensajes en cuestión eran parte de su red ni de una cuenta perteneciente a Pacheco Madera.[32] Siguiendo esa línea, testificó que no le podía decir a la jueza que Pacheco Madera, utilizando una cuenta de WhatsApp, envió los mensajes.[33] Sin haber más preguntas, comenzó el examen redirecto por parte del Ministerio, quien luego lo excusó.

Entonces, comenzó el examen directo de **Vélez Vega** por parte del Ministerio. Testificó que conocía a Pacheco Madera debido a que habían convivido y tenido una relación de pareja de diez (10) meses.[34] Explicó que, para el 29 de abril ya había terminado su relación, y que desde el 28 de abril del mismo año, a las 8:00 a.m., le había puesto la *Orden,* la cual le fue entregada a Pacheco Madera.[35] Abundó sobre las condiciones impuestas en la *Orden* que

---

[29] *Id.,* pág. 48, líneas 2-7 y pág. 49, líneas, 21 y 25.
[30] *Id.,* pág. 54, líneas 8-25.
[31] *Id.,* pág. 64, líneas 16-17.
[32] *Id.,* pág. 85, líneas 11-15 y 16-19.
[33] *Id.,* pág. 89, líneas 18-23.
[34] *Id.,* pág. 92, líneas 16-21.
[35] *Id.,* pág. 93, líneas 8-13 y 21-23 y pág. 94, líneas 19-21.

eran: (i) que no hubiera ningún acercamiento ni conversación con Vélez Vega ni su familia; (ii) que no fuera a donde estaba viviendo ni trabajando; (iii) que no hablara sobre Vélez Vega en las redes sociales; y, (iv) que no lo contactara por correo electrónico, cartas, mensajes de texto ni voz ni llamadas.[36] Entonces, relató que Pacheco Madera procedió a enviarle a través de WhatsApp cuarenta y seis (46) mensajes y a hacerle veintiocho (28) llamadas desde las 12:00 a.m. hasta las 9:14 a.m. del 29 de abril de 2021.[37] Vélez Vega testificó que el contenido de los mensajes era que ella lo amaba, que sabía que él la amaba, que no quería que le pusiera la *Orden* y así tener que esperar veinte (20) días para poder hablar con él.[38]

En lo que al otro incidente respecta, Vélez Vega testificó que, el 29 de abril de 2021, estaba a las 8:00 a.m. en el balcón de la residencia de su abuela y vio que la guagua de Pacheco Madera pasó frente a dicha residencia.[39] Explicó que reconoció la guagua por la enumeración de la tablilla.[40] Abundó que, luego de esperar algunos minutos procedió a caminar al perro de su abuela cuando Pacheco Madera apareció en su guagua y frenó a su lado y bajó la ventana.[41] Prosiguió diciendo, que Pacheco Madera le insistió que quería hablar con él, que lo amaba y que quería que le quitara la *Orden.*[42] Ante esa interacción, dice que regresó a la residencia y llamó a la policía.[43] Debido a esa llamada a la policía, testificó que Pacheco Madera le volvió a enviar mensajes que decían lo mismo, pero añadió que estaba con los policías y que la iban a arrestar.[44]

Finalizado el examen directo, comenzó el contrainterrogatorio a Vélez Vega por parte de la Defensa. Vélez Vega testificó que la

---

[36] *Id.,* pág. 94, líneas 6-11 y pág. 111, líneas 19-23 y 24.
[37] *Id.,* pág. 97, líneas 10-14; pág. 100, líneas 8-13 y 16-17; y pág. 101, líneas 1-3.
[38] *Id.,* pág. 99, líneas 14-20.
[39] *Id.,* pág. 101, líneas 5-8.
[40] *Id.,* pág. 103, líneas 3-4.
[41] *Id.,* pág. 104, líneas 11-14.
[42] *Id.,* pág. 105, líneas 5-7.
[43] *Id.,* pág. 105, líneas 21-22.
[44] *Id.,* pág. 106, líneas 12-15.

*Orden* surgió por una confrontación física que hubo entre él y Natalia el 27 de abril de 2021.[45] Al hacer más preguntas sobre ese incidente, testificó que al Agente De Jesús también le dijo que Pacheco Madero lo intentó matar asfixiándolo y que lo "pilló" con el portón en la espalda.[46] Debido al incidente, testificó que le salieron marcas en la espalda y los brazos.[47] Además, testificó que aunque cuando sacó la *Orden* indicó que Pacheco Madera tenía armas de fuego, en realidad esta no tenía.[48]

Al no tener más preguntas la Defensa, comenzó el redirecto a Vélez Vega por parte del Ministerio. En ese turno, Vélez Vega testificó que, a diferencia de cuando recibió las llamadas y mensajes, decidió llamar a la policía cuando Pacheco Madero apareció cerca de la residencia de su abuela, debido a que se sintió amenazado y ansioso.[49] No hubo recontra interrogatorio por parte de la Defensa.

Excusado el testigo, comenzó el examen directo del **Agente Nieves** por parte del Ministerio. Testificó que él fue quien diligenció la *Orden* el 28 de abril de 2021 a las 8:20 p.m.[50] Ante preguntas, **el Agente Nieves identificó a Pacheco Madera en sala**.[51] (Énfasis suplido). Abundó que, Pacheco Madera accedió a la explicación de lo que no podía hacer debido a la *Orden* y firmó el documento.[52] Sin haber más preguntas, comenzó el contrainterrogatorio al Agente Nieves por parte de la Defensa. Finalizado, el Ministerio procedió a realizar su examen redirecto. A preguntas de porqué en la *Orden* termina colocando las 10:30 p.m., testificó que fue debido a que hubo un recogido de pertenencias por parte de Vélez Vega, el cual

---

[45] *Id.,* pág. 121, líneas 3-5 y 11-13 y pág. 123, línea 22.
[46] *Id.,* pág. 131, línea 25; pág. 132, línea 5; y, pág. 134, línea 10 y 17.
[47] *Id.,* pág. 134, líneas 21-25.
[48] *Id.,* pág. 150, líneas 1-10.
[49] *Id.,* pág. 152, líneas 7-8.
[50] *Id.,* pág. 156, líneas 19-21 y pág. 165, líneas 16-20.
[51] *Id.,* pág. 157, líneas 8-14.
[52] *Id.,* pág. 160, líneas 24-25.

finalizó a esa hora con los agentes de la policía presentes.[53] El Agente Nieves fue excusado.

Llamado el quinto y último testigo, la **Agente O' Neil**, comenzó el examen directo por parte del Ministerio. Testificó que, el 29 de abril de 2021, fue la primera vez que intervino con Pacheco Madera, ya que recibió una llamada al cuartel de que hubo una violación a una *Orden*.[54] **La Agente O' Neil identificó a Pacheco Madera en sala**.[55] (Énfasis suplido). Respecto a las llamadas y mensajes, testificó que una vez llegó a la residencia de la abuela de Vélez Vega pudo observar que Pacheco Madera, ya que su nombre aparecía en la pantalla, le estaba escribiendo y llamándolo.[56] Abundó que, luego corroboró que el teléfono era de Pacheco Madera cuando la entrevistó y le tomó los datos.[57] Continuó testificando que, estando en la residencia de la abuela de Vélez Vega, este último recibió una llamada de un agente.[58] Con motivo de la llamada la Agente O' Neil fue a Auto Zone.[59] Explicó que, cuando llegó a Auto Zone, pudo observar la guagua que Vélez Vega y su mamá le habían indicado le pertenecía a Pacheco Madera.[60] Además, testificó que una vez la identifica, allí se encontraba Pacheco Madera con el agente que realizó la llamada.[61] Por lo tanto, testificó que procedió a explicarle que había una violación de la *Orden*, que estaba bajo arresto y le leyó las advertencias de Miranda.[62] Testificó que Pacheco Madera firmó las advertencias ya estando en el precinto.[63] Luego de ese proceso, testificó que tanto Vélez Vega como Pacheco Madera fueron

---

[53] *Id.,* pág. 175, líneas 22-25 y pág. 176, líneas 1-5.
[54] *Id.,* pág. 179, líneas 12-15.
[55] *Id.,* pág. 180, líneas 4-9.
[56] *Id.,* pág. 181, líneas 3-10 y 22-23.
[57] *Id.,* pág. 182, líneas 4-6.
[58] *Id.,* pág. 182, líneas 17-20.
[59] *Id.,* pág. 185, líneas 1-2.
[60] *Id.,* pág. 186, líneas 4-8.
[61] *Id.,* pág. 186, líneas 10-13 y pág. 187, líneas 6-7.
[62] *Id.,* pág. 186, líneas 15-18 y pág. 189, líneas 2-6.
[63] *Id.,* pág. 190, líneas 2-6 y pág. 193, líneas 23-25.

llevados al hospital y que a esta se le encontró en perfecto estado para continuar con el proceso.[64]

Finalizado el examen directo, comenzó el contrainterrogatorio por parte de la Defensa a la Agente O' Neil. Ante preguntas, testificó que atendió la llamada de Vélez Vega a las 9:10 a.m. y que se personó en la residencia a las 9:34 a.m.[65] Testificó que, luego de ella haber entregado el caso, Pacheco Madera fue llevada al hospital porque se estaba golpeando en la celda.[66]

Al no haber más preguntas, comenzó el examen redirecto por parte del Ministerio a la Agente O' Neil. Aclaró que la llamada de Vélez Vega se recibió a las 8:30 a.m. por el retén y que luego fue que se le notificó a ella a las 9:10 a.m.[67] Finalizado, la Defensa comenzó el recontrainterrogatorio. Testificó que en sus notas no aparece nada al respecto de que ella vio algún mensaje de texto o escuchó alguna llamada.[68] Sin más, el caso quedó sometido por el Ministerio y por la Defensa.[69]

El 28 de junio de 2022, el TPI emitió fallo de culpabilidad contra Pacheco Madera por infracción al Artículo 2.8 de la Ley Núm. 54-1989.[70] El fallo de culpabilidad se limitó a la conducta de Pacheco Madera de haber pasado por la residencia de la abuela de Vélez Vega. El TPI descartó que el Ministerio hubiese probado más allá de duda razonable las alegaciones en cuanto a mensajes de texto o mensajes de voz.

El 11 de julio de 2022, Pacheco Madera presentó una *Moción Urgente en Solicitud de Reconsideración de Fallo*. Solicitó la reconsideración del fallo de culpabilidad bajo la alegación de que la prueba presentada no estableció su identificación más allá de duda

---

[64] *Id.,* pág. 194, líneas 11-18.
[65] *Id.,* pág. 200, líneas 14-21.
[66] *Id.,* pág. 213, líneas 9-16.
[67] *Id.,* pág. 214, líneas 15-19.
[68] *Id.,* pág. 227, líneas 5-12.
[69] *Id.,* pág. 229, líneas 8-14.
[70] Art. 2.8, 8 LPRA § 628.

razonable. Expuso que, de los cinco (5) testigos presentados por el Ministerio, solo Vélez Vega poesía conocimiento personal de los hechos alegados, ya que el resto de los testigos declararon por investigación, información obtenida al atender la querella, sobre el diligenciamiento de la *Orden* y perito de crímenes cibernéticos. Abundó que, las identificaciones realizadas en corte abierta por el Agente De Jesús y por la Agente O' Neil, estaban condicionadas a que Vélez Vega identificara y conectara a la acusada con los hechos que el foro primario entendió probados en el pliego acusatorio.

El 23 de enero de 2023, se celebró el acto de Pronunciamiento de Sentencia y Pacheco Madera fue sentenciada a cumplir una sentencia de seis (6) años de reclusión bajo el régimen de sentencia suspendida, a tenor con la Ley de Sentencia Suspendida y Libertad a Prueba[71] (en adelante, Ley Núm. 259-1946), sujeta a supervisión electrónica. El TPI dispuso que:

> Esta pena se cumplirá de forma consecutiva con cualquier otra pena que estuviere cumpliendo.
> Se impone el pago de la pena especial (Ley 183).
> Se concede prórroga de treinta (30) días para el pago de la pena especial.
> Deberá cumplir con el Registro de Personas Convictas por Violaciones a la Ley de Prevención e Intervención con la Violencia Doméstica (Ley 59-2017).

Insatisfecha con el fallo emitido por el foro primario, el 21 de febrero de 2023, la apelante presentó un recurso de *Apelación Criminal*, mediante el cual esbozó la comisión de los siguientes cinco (5) errores por el foro primario:

A. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD POR LA INFRACCIÓN DE ARTÍCULO 2.8 DE LA LEY 54-1989 A PESAR DE NO HABERSE DERROTADO LA PRESUNCIÓN DE INOCENCIA Y NO HABERSE ESTABLECIDO LOS ELEMENTOS DEL DELITOS MÁS ALLÁ DE DUDA RAZONABLE.

B. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA DE BAYAMÓN AL DECLARAR CULPABLE A LA JOVEN NATALIA PACHECO MADERA A PESAR DE QUE ESTA

---

[71] Ley de Sentencia Suspendida y Libertad a Prueba, Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 LPRA § 1026 *et seq.*

NO FUE IDENTIFICADA EN CORTE ABIERTA POR EL ÚNICO TESTIGO CON CONOCIMIENTO PERSONAL DE LOS HECHOS Y NO FUE CONECTADA CON LOS HECHOS QUE SE ALEGARON EN EL PLIEGO ACUSATORIO.

C. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR CULPABLE A NATALIA PACHECO MADERA A PESAR DE QUE LA IDENTIFICACIÓN REALIZADA DURANTE EL JUICIO FUE INSUFICIENTE PARA ESTABLECER UNA CONVICCIÓN MAS ALLÁ DE DUDA RAZONABLE.

D. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR CULPABLE A LA JOVEN NATALIA PACHECO MADERA CON PRUEBA DE INDENTIFICACIÓN INADMISIBLE Y POR HABERSE EFECTUADO POR TESTIGOS SIN CONOCIMIENTO PERSONAL DE LOS HECHOS Y NO HABER EXISTIDO UN PROCESO EXTRAJUDICIAL DE IDENTIFICACIÓN CONFORME ESTATUIDO EN LAS REGLAS DE PROCEDIMIENTO CRIMINAL DE 1963, SEGÚN ENMENDADAS.

E. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA DE BAYAMÓN AL EMITIR UN FALLO DE CULPABILIDAD A PESAR DE QUE EL MINISTERIO PÚBLICO NO CUMPLIÓ SU CARGA PROBATORIA DE ESTABLECER LOS ELEMENTOS DEL DELITO Y CONEXIÓN CON LA ACUSADA MÁS ALLÁ DE DUDA RAZONABLE.

En su escrito de *Apelación Criminal*, la apelante informó a este Tribunal que se reservaba el derecho de plantear errores adicionales, una vez se analizara la totalidad de la prueba desfilada en el Juicio.[72] Informó que, se encuentra extinguiendo su sentencia bajo el régimen de libertad a prueba y que está siendo supervisada por el Departamento de Corrección y Rehabilitación, Programa de la Comunidad de Bayamón. De ahí, y luego de varios incidentes procesales, mediante *Resolución* del 14 de julio de 2023, esta Curia acogió la transcripción de la prueba oral (en adelante, TPO) como una estipulada.

Subsiguientemente, el 24 de agosto de 2023, la apelante presentó escrito intitulado *Alegato Suplementario de la Parte Apelante* (en adelante, *Alegato Suplementario*). Allí esgrimió la comisión de cinco

---

[72] Recurso de *Apelación Criminal,* a la pág. 2.

(5) errores por el foro primario, los cuales en esencia se asimilan a los esbozados en el recurso de *Apelación Criminal*, a saber:

1. ERRÓ [EL] HONORABLE TPI AL EMITIR UN FALLO DE CULPABILIDAD POR INFRACCIÓN AL ARTÍCULO 2.08 DE LA LEY 54-1989 A PESAR DE NO HABERSE ESTABLECIDO TODOS LOS ELEMENTOS DEL DELITO MÁS ALLÁ DE DUDA RAZONABLE.

2. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR CULPABLE A LA JOVEN NATALIA PACHECO MADERA A PESAR DE QUE ÉSTA NO FUE IDENTIFICADA POR EL ÚNICO TESTIGO QUE OSTENTABA CONOCIMIENTO PERSONAL DE LOS HECHOS ALEGADOS Y NO FUE CONECTADA CON ESTOS.

3. ERRÓ EL HONORABLE TPI AL DECLARAR CULPABLE A LA JOVEN NATALIA PACHECO MADERA A PESAR DE QUE LA IDENTIFICACIÓN REALIZADA DURANTE EL JUICIO FUE INSUFICIENTE PARA ESTABLECER UNA CONVICCIÓN MÁS ALLÁ DE DUDA RAZONABLE.

4. ERRÓ EL HONORABLE TPI AL DECLARAR CULPABLE A NATALIA PACHECO MADERA CON PRUEBA DE IDENTIFICACIÓN SIN CONOCIMIENTO PERSONAL DE LOS HECHOS Y NO HABER EXISTIDO UN PROCESO EXTRAJUDICIAL DE IDENTIFICACIÓN CONFORME ESTABLECEN LAS REGLAS DE PROCEDIMIENTO CRIMINAL DE 1963, SEGÚN ENMENDADA.

5. ERRÓ EL HONORABLE TPI AL EMITIR UN FALLO DE CULPABILIDAD A PESAR DE QUE EL MINISTERIO PÚBLICO NO CUMPLIÓ SU CARGA PROBATORIA DE ESTABLECER TODOS LOS ELEMENTOS DEL DELITO Y LA CONEXIÓN CON LA ACUSADA MÁS ALLÁ DE DUDA RAZONABLE.

Mediante *Resolución* del 2 de octubre de 2023, este Tribunal ordenó la elevación de los autos originales del caso del título. Luego, el 5 de octubre de 2023, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, presentó escrito intitulado *Alegato de el (sic) Pueblo* (en adelante, *Alegato del Pueblo*).

Contando con el beneficio de la comparecencia de ambas partes, así como con los autos originales del caso del título y la totalidad del expediente ante nuestra consideración, nos encontramos en posición de resolver.

## II

### A. Apelación Criminal

El trámite procesal de un recurso de apelación criminal, desde el Tribunal de Primera Instancia, pasando por este Tribunal intermedio, y hasta el Tribunal Supremo de Puerto Rico (en adelante, Tribunal Supremo), se rige por las Reglas 193 a 217 de las Reglas de Procedimiento Criminal, según enmendadas.[73] Asimismo, las Reglas 23 a 30.1 del Reglamento de nuestro Tribunal[74], rigen el trámite a seguir desde la presentación del recurso de apelación criminal, hasta su perfeccionamiento. La Regla 194 de las Reglas de Procedimiento Criminal y la Regla 23 de nuestro Reglamento disponen que, un escrito de apelación criminal contra una sentencia emitida por el foro primario tiene que ser presentado ante el Tribunal de Apelaciones dentro del término jurisdiccional de treinta (30) días, computados a partir de la fecha en que se dictó la sentencia.[75] Como es sabido, un plazo jurisdiccional es de carácter fatal. Ello quiere decir que no admite justa causa, es improrrogable, y que su incumplimiento es insubsanable.[76]

En lo pertinente al caso de autos, destacamos que la Regla 194 de las Reglas de Procedimiento Criminal, dispone que una parte puede solicitar la reconsideración de la sentencia o del fallo condenatorio, dentro de un término improrrogable de quince (15) días, desde que la sentencia fue dictada.[77]

### B. Ley Núm. 54-1989

La Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54-1989, fue promulgada con el propósito de: (i) establecer un conjunto de medidas dirigidas a prevenir y combatir

---

[73] 34 LPRA Ap. II, R. 193-217.
[74] 4 LPRA Ap. XXII-B, R. 23-30.1.
[75] *Id.*, R. 23. 34 LPRA Ap. II, R. 194.
[76] *Martínez, Inc. v. Abijoe Realty Corp.*, 151 DPR 1, 7 (2000). *Arriaga v. FSE*, 145 DPR 122, 131 (1998). *Loperena Irizarry v. ELA*, 106 DPR 357, 360 (1977).
[77] 34 LPRA Ap. II, R. 194.

la violencia doméstica en Puerto Rico; y, (ii) facultar a los tribunales a expedir órdenes de protección para las víctimas de violencia doméstica; entre otras razones. El aspecto novel de esta legislación descansa en la facultad otorgada a los Jueces del TPI y los Jueces Municipales para dictar medidas afirmativas de protección a las víctimas a través de la expedición de órdenes dirigidas a la persona agresora para que se abstenga de incurrir en determinada conducta con respecto a la víctima.[78]

El Artículo 1.3 de dicha ley define orden de protección como sigue: "Significa todo mandato expedido por escrito bajo el sello de un tribunal, en la cual se dictan las medidas a un[a] [persona] agresor[a] para que se abstenga de incurrir o llevar a cabo determinados actos o conducta constitutivos de violencia doméstica".[79] Por su parte, el Capítulo II de la referida legislación aborda lo relativo a las órdenes de protección y los aspectos procesales. A esos efectos, el Artículo 2.8 dispone lo concerniente al incumplimiento de órdenes de protección:

> **Cualquier violación a sabiendas de una orden de protección expedida**, de conformidad con esta Ley, **será castigada como delito grave** de tercer grado en su mitad inferior, disponiéndose que **los tribunales vendrán obligados a imponer supervisión electrónica, de concederse cualquier tipo de sentencia suspendida**. No obstante, lo dispuesto por la Regla 11 de las Reglas de Procedimiento Criminal, según enmendada, aunque no mediare una orden a esos efectos, todo oficial del orden público deberá efectuar un arresto, si se le presenta una orden de protección expedida al amparo de esta Ley o de una ley similar, contra la persona a ser arrestada; o si determina que existe dicha orden mediante comunicación con las autoridades pertinentes, el patrono de la peticionaria o la compañía de seguridad que tenga a cargo el control de acceso donde reside la peticionaria y tienen motivos fundados para creer que se han violado las disposiciones del mismo.[80] (Énfasis suplido).

---

[78] Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, según enmendada, Exposición de Motivos.
[79] Art. 1.3 (i), 8 LPRA § 602.
[80] Art. 2.8, 8 LPRA § 628.

## C. La Identificación de la Persona Acusada

La identificación de la persona acusada es una de las etapas más esenciales o críticas en el procedimiento criminal, debido a que no puede haber una convicción sin prueba que conecte o señale a la persona imputada de delito como la responsable del hecho delictivo.[81] Este proceso de identificación pude ocurrir en corte abierta (identificación judicial) o fuera del ámbito judicial (identificación extrajudicial) que comúnmente ocurre en la fase de la investigación policíaca. A esos efectos, la evaluación de los perjuicios de una identificación requiere un análisis abarcador, de modo que tome en consideración la totalidad de las circunstancias que rodean el proceso de identificación y los hechos particulares del caso.[82] El Tribunal Supremo ha expresado que: "De ahí que una identificación maculada con alguna sugestividad, per se, no es inadmisible ni vicia la identificación positiva habida en el acto del juicio si está fundada en el conocimiento previo y recuerdo de la identidad del acusado por la víctima u otros testigos".[83] A la luz de lo anterior, en situaciones en que la víctima conoce previamente a la persona acusada, las salvaguardas contra la sugestividad tales como los requisitos establecidos en la Regla 252 de las Reglas de Procedimiento Criminal[84], se reducen a un mínimo o, dependiendo de las circunstancias, son inaplicables e innecesarios.[85] No obstante, debemos recordar que la presencia de sugestión no excluye irremisiblemente la prueba, sino que impone al juzgador la labor de separar campos en el testimonio para determinar su

---

[81] *Pueblo v. Hernández González*, 175 DPR 274, 289 (2009). *Pueblo v. Rodríguez Maysonet*, 119 DPR 302, 309 (1987).

[82] *Pueblo v. Hernández González, Id.*, 289-290. *Simmons v. United States*, 390 US 377, 383 (1968).

[83] *Pueblo v. Mattei Torres*, 121 DPR 600, 607 (1988). Pueblo v. Rey Marrero, 109 DPR 739, 747 (1980).

[84] 34 LPRA Ap. II, R. 252.

[85] *Pueblo v. Mattei Torres*, 121 DPR 600, 608 (1988). Pueblo v. Lebrón González, 113 DPR 81, 99 (1982).

confiabilidad y la existencia de prueba de identificación no influida ni maculada por conducta sugestiva.[86]

### D. Presunción de Inocencia y Duda Razonable

La Carta de Derechos de la Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia.[87] Este imperativo constitucional también se ha incorporado estatutariamente mediante la Regla 304 de las Reglas de Evidencia.[88] Asimismo, la Regla 110 de las Reglas de Procedimiento Criminal reitera el precitado derecho fundamental.[89] Por medio de esta norma, se exige que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario. Ello constituye uno de los imperativos del debido proceso de ley.[90] A tales efectos, nuestro ordenamiento requiere que, para rebatir tal presunción, el Estado establezca la culpabilidad una persona imputada de delito más allá de duda razonable.[91]

Dicho de otro modo, para controvertir la presunción de inocencia se exige un *quantum* probatorio de más allá de duda razonable. Cabe destacar que duda razonable implica necesariamente aquella que produce insatisfacción o intranquilidad en la conciencia del juzgador respecto a la evidencia presentada en el caso.[92] Sobre este requisito, el Tribunal Supremo ha expresado que:

> El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada,

---

[86] *Pueblo v. Mattei Torres, supra. Pueblo v. Peterson Pietersz,* 107 DPR 172, 184 (1978).
[87] CONST. PR, art. II, § 11. *Pueblo v. Resto Laureano,* 206 DPR 963, 967 (2021). *Pueblo v. De Jesús Mercado,* 188 DPR 467, 475 (2013).
[88] 32A LPRA Ap. VI, R. 304 (1).
[89] 34 LPRA Ap. II, R. 110.
[90] *Pueblo v. Irizarry,* 156 DPR 780, 786 (2002). *Pueblo v. León Martínez,* 132 DPR 746, 764 (1993).
[91] *Pueblo v. Arlequín Vélez,* 204 DPR 117, 146 (2020). *Pueblo v. Toro Martínez,* 200 DPR 834, 855-56 (2018). *Pueblo v. Cabán Torres,* 117 DPR 645, 652 (1986).
[92] *Pueblo v. Irizarry, supra,* 788.

"además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada".[93]

Así, la presentación de la prueba debe ir dirigida a demostrar la existencia de "cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste".[94] "La determinación de que cierta prueba es suficiente para demostrar la culpabilidad del acusado más allá de duda razonable es una cuestión de raciocinio, **producto de un análisis de todos los elementos de juicio del caso** y no una mera duda especulativa o imaginaria".[95] (Énfasis suplido).

### E. Peso de la Prueba

El peso de la prueba es la obligación que tiene la parte que afirma la cuestión en controversia, de convencer al juzgador sobre la forma particular en que ocurrieron los hechos que alega.[96] Como regla general, esa obligación de persuadir al juzgador sobre la existencia de los elementos esenciales de una acusación la tiene el Ministerio en un caso criminal.[97] Así, pues, en el juicio existen dos (2) tipos de cargas probatorias: (i) la carga de producir y presentar evidencia para establecer los hechos particulares que componen una controversia dentro de la reclamación; y, (ii) la obligación de persuadir al juzgador para establecer una reclamación conforme a derecho.[98] En lo que respecta a la evaluación y suficiencia de la prueba, las Reglas de Evidencia disponen que:

La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar

---

[93] *Pueblo v. De Jesús Mercado, supra,* 476, citando a *Pueblo v. Cabán Torres, supra.*

[94] *Pueblo v. De Jesús Mercado, Id. Pueblo v. Santiago,* 176 DPR 133, 142 (2009).

[95] *Pueblo v. De Jesús Mercado, Id.,* 475-76.

[96] Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, Segunda Edición, Ediciones Situm, 2005, pág. 148. E. L. Chiesa, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, Tomo II, Publicaciones J.T.S., 2005, pág. 1003.

[97] Emmanuelli Jiménez, op.cit., págs. 148-149. E. L. Chiesa, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, op.cit., pág. 1002.

[98] Prontuario de Derecho Probatorio Puertorriqueño, *Id.,* a las págs. 148 y 150.

cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:

(A) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.

(B) La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.

[…]

(D) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

(E) La juzgadora o el juzgador de hechos no tiene la obligación de decidir de acuerdo con las declaraciones de cualquier cantidad de testigos que no le convenzan contra un número menor u otra evidencia que le resulte más convincente.[99]

[…]

## F. Apreciación de la Prueba y Estándar de Revisión Apelativa

La determinación de si la culpabilidad de una persona acusada fue probada más allá de duda razonable, es revisable en apelación, puesto que "la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho".[100] Ahora bien, como es sabido, el ejercicio discrecional de la apreciación de la prueba que ejerce el TPI está revestido de confiabilidad y merece respeto y deferencia.[101] Por ello, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales.[102]

> […] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; **le faltará el**

---

[99] 32 LPRA Ap. VI, R. 110.

[100] *Pueblo v. Torres Medina*, 2023 TSPR 50. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011). *Pueblo v. Irizarry, supra.*

[101] *Argüello v. Argüello*, 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). *Trinidad v. Chade*, 153 DPR 280, 289 (2001).

[102] *Pueblo v. Santiago, supra*, 148. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

**instrumento más útil para la investigación de la verdad: la observación**.[103] (Énfasis suplido).

Respecto a las declaraciones de un testigo, en el caso *Pueblo v. De Jesús Mercado,* el Tribunal Supremo reiteró que:

En *Pueblo v. Chévere Heredia,* 139 DPR 1, 15–16 (1995), reiteramos que el testimonio de un testigo principal, por sí solo, de ser creído, **es suficiente en derecho para sostener un fallo condenatorio, aun cuando no haya sido un testimonio "perfecto", pues "[e]s al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables** [...]". Esto es así porque en Puerto Rico la máxima *falsus in uno, falsus in omnibus* no autoriza a rechazar toda la declaración de un testigo porque se haya contradicho o faltara a la verdad respecto a uno o más aspectos de su declaración. *Quintana Tirado v. Longoria,* 112 DPR 276, 292 esc. 9 (1982). En ese sentido, la misión de los tribunales requiere armonizar y analizar en conjunto e integralmente toda la prueba, para así arribar a una conclusión correcta y razonable del peso que se ha de conceder al testimonio en su totalidad. Íd. Por esa razón, **el hecho de que un testigo incurra en ciertas contradicciones no significa que se deba descartar absolutamente el resto de la declaración cuando nada increíble o improbable surge de su testimonio.** *Pueblo v. Chévere Heredia, supra,* pág. 15.[104] (Énfasis suplido).

En consecuencia, al este Tribunal Apelativo enfrentarse a la tarea de revisar las determinaciones del foro de instancia, no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, a no ser que haya mediado error manifiesto, pasión, prejuicio o parcialidad.[105]

De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble.[106] Dicho de otro modo, este Tribunal solo podrá intervenir con la apreciación del foro

---

[103] *Pueblo v. Toro Martínez, supra,* 857, citando a *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1995).

[104] *Pueblo v. De Jesús Mercado, supra,* 476-477.

[105] *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011). *Ramírez Ferrer v. Conagra Foods PR,* 175 DPR 799, 811 (2009). *Pueblo v. Irizarry, supra,* 789. *Pueblo v. Maisonave,* 129 DPR 49, 62-63 (1991).

[106] *Pueblo v. Martínez Landrón,* 202 DPR 409, 424 (2019), citando a *Pueblo v. Maisonave, supra,* 63. *Pueblo v. Viruet Camacho,* 173 DPR 563, 584 (2009). *Pueblo v. Irizarry, supra. Pueblo v. Acevedo Estrada, supra.*

juzgador si, luego de evaluar minuciosamente la prueba del caso, guardamos serias, razonables y fundadas dudas acerca de la culpabilidad de la persona acusada.[107]

En síntesis, a menos que existan los elementos antes mencionados o que la apreciación de la prueba se aleje de la realidad fáctica o que ésta sea inherentemente imposible o increíble, el tribunal apelativo deberá abstenerse de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos.[108]

**III**

La apelante acude ante nos mediante un recurso de *Apelación Criminal* y esboza que el foro primario cometió cinco (5) errores, entiéndase que, erró el TPI al emitir un fallo de culpabilidad por infracción al Artículo 2.8 de la Ley Núm. 54-1989 contra Pacheco Madera, a pesar de que presuntamente: (i) no se establecieron todos los elementos del delito más allá de duda razonable; (ii) que la apelante no fue identificada por el único testigo que ostentaba conocimiento personal de los hechos alegados y no fue conectada con estos; (iii) que la identificación realizada durante el *Juicio* fue insuficiente para establecer una convicción más allá de duda razonable; (iv) que fue utilizando prueba de identificación sin conocimiento personal de los hechos y no haber existido un proceso extrajudicial de identificación conforme establecen las Reglas de Procedimiento Criminal de 1963, según enmendada; y, (v) que el Ministerio no cumplió su carga probatoria de establecer todos los elementos del delito y la conexión con la acusada más allá de duda razonable. No nos convence. Veamos.

Producto de la Vista Preliminar, el foro primario determinó que existía causa probable para creer que Pacheco Madera había cometido el delito de infracción al Artículo 2.8 de la Ley Núm. 54-

---

[107] *Pueblo v. Casillas Torres*, 190 DPR 398, 415 y 417 (2014).
[108] *Pueblo v. Arlequín Vélez, supra*, 148. *Pueblo v. Maisonave, supra.*

1989 por hechos ocurridos el 29 de abril de 2021.[109] A la luz de lo anterior, se presentó una *Acusación* por delito grave contra Pacheco Madera por infracción al Artículo 2.8 de la Ley Núm. 54-1989.[110] En la *Acusación* se expuso que Pacheco Madera violentó, a sabiendas, las prohibiciones estipuladas en la *Orden* a favor de Vélez Vega, con quien sostuvo una relación consensual. Los hechos consistían en que alegadamente Pacheco Madera le envió mensajes de texto y de voz y realizó llamadas a Vélez Vega, y luego se personó en la residencia de la abuela de Vélez Vega, donde este residía.

A raíz de ello, se celebró el *Juicio* por tribunal de derecho. Durante el *Juicio*, el Ministerio presentó como prueba de cargo a los siguientes cinco (5) testigos: (i) Agente De Jesús, (ii) Agente Morales, (iii) Vélez Vega, (iv) Agente Nieves, y (v) Agente O' Neil. Comenzado el *Juicio*, Pacheco Madera hizo alegación de no culpabilidad, en relación con el Artículo 2.8 de la Ley Núm. 54-1989.[111]

Desfilada la prueba, el foro primario emitió fallo de culpabilidad contra Pacheco Madera por infracción al Artículo 2.8 de la Ley Núm. 54-1989.[112] El fallo de culpabilidad se limitó a la conducta de Pacheco Madera de haber pasado por la residencia de la abuela de Vélez Vega. Celebrado el acto de Pronunciamiento de Sentencia, Pacheco Madera fue sentenciada a cumplir una condena de seis (6) años de reclusión, bajo el régimen de sentencia suspendida, a tenor con la Ley Núm. 259-1946[113], sujeta a supervisión electrónica.

En el caso ante nos, no existe controversia respecto a que existía una *Orden* emitida, válida y diligenciada otorgada por el Tribunal el 28 de abril de 2021, de conformidad con la Ley Núm. 54-

---

[109] Art. 2.8, 8 LPRA § 628.
[110] *Id.*
[111] *Id.* En la TPO, pág. 8, líneas 6-10.
[112] Art. 2.8, 8 LPRA § 628.
[113] Ley de Sentencia Suspendida y Libertad a Prueba, Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 LPRA § 1026 *et seq.*

1989[114], con vigencia hasta el 18 de mayo de 2021. Es decir, la *Orden* se encontraba vigente cuando ocurrió el incidente del 29 de abril de 2021. Una *Orden* es todo mandato expedido por escrito bajo el sello de un tribunal, en la cual se dictan las medidas a una persona agresora para que se abstenga de incurrir o llevar a cabo determinados actos o conducta constitutivos de violencia doméstica.[115] En este caso, la *Orden* iba dirigida contra Pacheco Madera. Las condiciones impuestas en la *Orden* eran las siguientes: **(i) que no hubiese ningún acercamiento ni conversación de parte de Pacheco Madera con Vélez Vega ni su familia**; **(ii) que no fuera a donde estaba viviendo ni trabajando**; (iii) que no hablara sobre Vélez Vega en las redes sociales; y, (iv) que no lo contactara por correo electrónico, cartas, mensajes de texto ni voz ni llamadas.[116] (Énfasis suplido). A tales efectos, para el Tribunal dilucidar en el *Juicio* si ocurrió o no una violación de la *Orden,* no resultaba necesario dirimir los hechos por los cuales esta se expidió. Al aquilatar la prueba vertida en el *Juicio,* el foro primario entendió que, tras haber sido diligenciada una *Orden de Protección,* Pacheco Madera la violó al acercarse a la residencia de Vélez Vega, que cuando surgieron los hechos de este caso, este residía en la residencia de su abuela.

El presente caso nos intima a evaluar la evidencia que el juzgador de hechos tuvo ante sí, con el fin de ponderar si se sostiene la *Sentencia* impuesta. En particular, se impugna la suficiencia de la identificación de la acusada, aquí apelante.

Por imperativo constitucional, la culpabilidad de toda persona acusada de delito sólo se establece probando más allá de toda duda razonable todos los elementos del delito y su conexión con la

---

[114] Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, según enmendada.
[115] Art. 1.3 (i), 8 LPRA § 602.
[116] En la TPO, pág. 94, líneas 6-11 y pág. 111, líneas 19-23 y 24.

persona acusada.[117] La identificación de la persona acusada es una de las etapas más esenciales o críticas en el procedimiento criminal, debido a que no puede haber una convicción sin prueba que conecte o señale a la persona imputada de delito como la responsable del hecho delictivo.[118] Ahora bien, por encontrarse estrechamente relacionados el *segundo*, *tercer* y *cuarto* error serán discutidos en conjunto, mientras que el *primer* y *quinto* error esgrimido por la apelante, serán discutidos en conjunto, pero de forma separada a los anteriores.

Comenzando por el *segundo*, *tercer* y *cuarto* error, en ellos, Pacheco Madera nos plantea que el foro incidió al emitir un fallo de culpabilidad, aduciendo que esta no fue identificada por el único testigo con conocimiento personal de los hechos, sino, utilizando prueba de identificación por un testigo sin conocimiento personal de los hechos, sin que se hubiese llevado a cabo un proceso extrajudicial de identificación, por lo que la identificación en este caso fue insuficiente. No le asiste razón. Veamos.

Comenzamos recalcando, que se requiere un proceso extrajudicial de identificación en aquellas ocasiones en que la víctima o el testigo ocular de un delito no conozcan a la persona que lo cometió.[119] Luego de hacer esa salvedad, señalamos que revisada y estudiada la TPO, coincidimos con la apelante en que Vélez Vega no identificó a Pacheco Madera durante el *Juicio*. Sin embargo, el Agente De Jesús, a preguntas del Ministerio, identificó a la apelante durante el *Juicio*. Lo anterior se desprende de la TPO.[120] De igual forma, el Agente Nieves identificó a Pacheco Madera en sala.[121] Además, la Agente O' Neil también identificó a la apelante en sala,

---

[117] *Pueblo* v. *Irizarry, supra. Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974).

[118] *Pueblo v. Hernández González, supra*, 289. *Pueblo v. Rodríguez Maysonet, supra.*

[119] *Pueblo v. Toro Martínez, supra.*

[120] En la TPO, pág. 16, líneas 19-22.

[121] *Id.,* pág. 157, líneas 8-14.

siendo la tercera testigo en hacerlo.[122] No obstante, regresando a Vélez Vega, no puede menoscabarse que la identificación de Pacheco Madera, por parte de este, el único testigo con conocimiento personal del hecho delictivo ha sido sostenida en varias instancias. Vélez Vega identificó a Pacheco Madera en, al menos, dos (2) ocasiones sin intervención del Estado: (i) cuando solicitó la *Orden* y esta le fue diligenciada a Pacheco Madera, y (ii) cuando llamó a la policía debido a que Pacheco Madera violó la *Orden* al pasar por la residencia de su abuela donde este residía.

Puntualizamos que, en el examen directo Vélez Vega testificó que su conocimiento de la persona de Pacheco Madera surge debido a que habían convivido en la residencia de ésta y tenido una relación de pareja de diez (10) meses.[123] En lo que respecta al incidente por el cual se encontró culpable a Pacheco Madera, Vélez Vega testificó que el 29 de abril de 2021, estaba a las 8:00 a.m. en el balcón de la residencia de su abuela donde éste residía y vio que la guagua de Pacheco Madera pasó frente a dicha residencia.[124] Explicó que reconoció la guagua de Pacheco Madera por la enumeración de la tablilla.[125] Abundó que, luego de esperar algunos minutos para asegurarse no volver a ver la guagua en cuestión, procedió a caminar al perro de su abuela cuando Pacheco Madera apareció en su guagua y frenó a su lado y bajó la ventana.[126] Prosiguió diciendo que Pacheco Madera le insistió que quería hablar con él, que lo amaba y que quería que le quitara la *Orden*.[127] En el redirecto, Vélez Vega testificó que, a diferencia de cuando recibió las llamadas y mensajes, decidió llamar a la policía cuando Pacheco Madero apareció cerca de

---

[122] *Id.,* pág. 180, líneas 4-9.
[123] *Id.,* pág. 92, líneas 16-21.
[124] *Id.,* pág. 101, líneas 5-8.
[125] *Id.,* pág. 103, líneas 3-4.
[126] *Id.,* pág. 104, líneas 11-14.
[127] *Id.,* pág. 105, líneas 5-7.

la residencia de su abuela debido a que se sintió amenazado y ansioso.[128]

En lo que respecta a la Agente O' Neil, testificó que, estando en la residencia de la abuela de Vélez Vega, este último recibió una llamada de un agente.[129] Con motivo de la llamada la Agente O' Neil fue a Auto Zone.[130] Explicó que cuando llegó a Auto Zone, pudo observar que se encontraba la guagua que Vélez Vega y su mamá le habían indicado que le pertenecía a Pacheco Madera.[131] Además, testificó que una vez la identifica, allí se encontraba Pacheco Madera con el agente que realizó la llamada.[132] Por lo tanto, testificó que procedió a explicarle que había una violación de la *Orden*, que estaba bajo arresto y le leyó las advertencias de Miranda.[133] Testificó que Pacheco Madera firmó las advertencias ya estando en el precinto.[134] Finalizado el examen directo, comenzó el contrainterrogatorio por parte de la Defensa a la Agente O' Neil. Ante preguntas, testificó que atendió la llamada de Vélez Vega a las 9:10 a.m. y que se personó en la residencia a las 9:34 a.m.[135] Al no haber más preguntas, comenzó el examen redirecto por parte del Ministerio a la Agente O' Neil. Aclaró que la llamada de Vélez Vega se recibió a las 8:30 a.m. por el retén y que luego fue que se le notificó a ella a las 9:10 a.m.[136]

Tras examinar los alegatos de los apelantes, la TPO y los autos originales, podemos colegir que el foro *a quo* no incidió en la apreciación de la prueba presentada ante sí. Es menester recordar que la evaluación de los perjuicios de una identificación requiere un análisis abarcador, **de modo que tome en consideración**

---

[128] *Id.,* pág. 152, líneas 7-8.
[129] *Id.,* pág. 182, líneas 17-20.
[130] *Id.,* pág. 185, líneas 1-2.
[131] *Id.,* pág. 186, líneas 4-8.
[132] *Id.,* pág. 186, líneas 10-13 y pág. 187, líneas 6-7.
[133] *Id.,* pág. 186, líneas 15-18 y pág. 189, líneas 2-6.
[134] *Id.,* pág. 190, líneas 2-6 y pág. 193, líneas 23-25.
[135] *Id.,* pág. 200, líneas 14-21.
[136] *Id.,* pág. 214, líneas 15-19.

**la totalidad de las circunstancias que rodean el proceso de identificación y los hechos particulares del caso**.[137] (Énfasis suplido). Así, las cosas, **en situaciones en que la víctima conoce previamente a la persona acusada**, **las salvaguardas contra la sugestividad tales como los requisitos establecidos en la Regla 252 de las Reglas de Procedimiento Criminal**[138], **se reducen a un mínimo o, dependiendo de las circunstancias, son inaplicables e innecesarios**.[139] (Énfasis suplido).

Pasando al *primer* y *quinto* error, vemos que Pacheco Madera nos invita a concluir que, en el presente caso, el TPI erró al emitir un fallo de culpabilidad, arguyendo que en este caso el Ministerio no cumplió con su carga probatoria de establecer todos los elementos del delito más allá de duda razonable y su conexión con esta, más allá de duda razonable. No le asiste razón. Veamos.

El TPI escuchó, analizó y justipreció los testimonios de: (i) Agente De Jesús, (ii) Agente Morales, (iii) Vélez Vega, (iv) Agente Nieves, y (v) Agente O' Neil. Tras ese ejercicio, les confirió valor probatorio suficiente para sostener la culpabilidad de Pacheco Madera. Así, a pesar de las preguntas y los argumentos presentados por la Defensa con el objetivo de impugnar a los testigos de cargo, el juzgador, al sopesar los testimonios junto a las demás pruebas admitidas les otorgó credibilidad.

A la luz de la totalidad de la prueba, se demostró más allá de duda razonable la culpabilidad de la apelante, configurándose los elementos del delito imputado y la intención criminal en la comisión de dicho delito. Acentuamos que, la determinación de que cierta prueba es suficiente para demostrar la culpabilidad de la persona

---

[137] *Pueblo v. Hernández González*, *supra*, 289-290. *Simmons v. United States*, *supra*, 383.

[138] 34 LPRA Ap. II, R. 252. La Regla 252 de las Reglas de Procedimiento Criminal aborda la identificación anterior al juicio.

[139] *Pueblo v. Mattei Torres*, 121 DPR 600, 608 (1988). *Pueblo v. Lebrón González*, 113 DPR 81, 99 (1982).

acusada más allá de duda razonable es una cuestión de raciocinio, **producto de un análisis de todos los elementos de juicio del caso** y no una mera duda especulativa o imaginaria.[140] (Énfasis suplido). Sostenemos que, lo que se exige es "prueba satisfactoria y suficiente en derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido".[141]

Reiteramos que, es regla general que la obligación de persuadir al juzgador sobre la existencia de los elementos esenciales de una acusación la tiene el Ministerio en un caso criminal.[142]

Enfatizamos que, al este Tribunal Apelativo enfrentarse a la tarea de revisar las determinaciones del foro de primera instancia, no debemos intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, a no ser que haya mediado error manifiesto, pasión, prejuicio o parcialidad.[143] Subrayamos que, **nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos**.[144] (Énfasis suplido). Consecuentemente, este Curia solo podrá intervenir con la apreciación del foro juzgador si, luego de evaluar minuciosamente la prueba del caso, guardamos serias, razonables y fundadas dudas acerca de la culpabilidad de la persona acusada.[145] Expresado todo lo anterior, juzgamos que los errores esgrimidos no fueron cometidos, por tanto, procede confirmar el dictamen apelado.

---

[140] *Pueblo v. De Jesús Mercado, supra,* 475-476.
[141] *Pueblo v. Toro Martínez, supra,* 856.
[142] Emmanuelli Jiménez, op.cit., págs. 148-149. E. L. Chiesa, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, op.cit., pág. 1002.
[143] *González Hernández v. González Hernández, supra. Ramírez Ferrer v. Conagra Foods PR, supra. Pueblo v. Irizarry, supra. Pueblo v. Maisonave, supra,* 62-63.
[144] *Pueblo v. Toro Martínez, supra,* 857.
[145] *Pueblo v. Casillas Torres, supra.*

**IV**

Por los fundamentos que anteceden, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones